**The STATE of Ohio, Appellee,**

**v.**

**WALKER, Appellant.**

[Cite as *State v. Walker* (1990), 66 Ohio App.3d 518.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 56684.

Decided April 23, 1990.

*John T. Corrigan,* Prosecuting Attorney, and *Ronald James,* Assistant Prosecuting Attorney, for appellee.

*Richard G. Lillie,* for appellant.

AUGUST PRYATEL, Judge.

On August 19, 1988, defendant-appellant Dwayne Walker was indicted with Clemmit Cannon, Jr. for felonious assault with gun and violence specifications.

Prior to trial, appellant filed a motion for a separate trial. The record fails to show whether the court conducted a hearing regarding appellant's motion. Appellant and Cannon were tried jointly before a jury.

Evidence adduced by the state revealed that James Smith, Darryl Steele, Charles Freeman and Shawn Rawland were riding in Smith's car en route to Steele's house. Steele was sitting in the front passenger's seat and Freeman and Rawland were sitting in the back seat. Upon arrival, Steele noticed that two cars were parked in front of his driveway. As Smith's car came to a stop, someone thrust a gun into the front passenger's window of Smith's car and fired one shot. A bullet struck both Steele in the arm and Smith in the wrist. At the same time the shot was fired, someone smashed Smith's back window.

The state presented six witnesses. Rear seat passengers Freeman and Rawland both testified that they did not see who fired the shot or who smashed the window. Steele (front seat passenger) testified that the appellant fired one shot into the car. The bullet passed through Steele's arm and lodged in Smith's (the driver's) wrist. Smith testified that he did not see who fired the shot.

Following the above testimony, a voir dire examination of Steele and Smith was conducted by the state outside the presence of the jury (during lunch, the state had learned from these witnesses about exculpatory testimony regarding the appellant). Steele recanted his testimony and stated that appellant was not the man who shot him. Steele stated: "the gunman was taller than [appellant] although he was [a] splitting [sic] image [of him]. [Appellant is] just too short." Steele testified that he originally identified appellant as the gunman because appellant's picture had been thrust upon him while he was in the hospital and he had seen appellant before; not because he actually saw appellant pull the trigger. Smith testified that appellant did not fire the shot and that he did not see appellant by the car on the day in question.

Upon resumption of trial, Smith was called as a defense witness to give his voir dire testimony. Smith explained that during voir dire, he had testified that he did not see the gunman and that appellant did not shoot him. Smith also testified that the gunman had to be taller than the appellant in order to reach into the car because of the height of the shock absorbers on Smith's car.

State witness, Charles Thompson, an original suspect, signed a statement while he was "locked up" that he had witnessed the incident. However, at

trial he testified that he did not witness the shooting, nor did he even hear a gunshot.

The state's final witness was Detective Curtain of the Warrensville Heights Police Department. Detective Curtain twice interviewed appellant's co-defendant, Clemmit Cannon, who is a cousin of Walker. Curtain testified that originally the co-defendant had told him that he did not know anything about the shooting and that he had nothing to do with the shooting. Curtain testified that during the second interview the co-defendant stated that the appellant was the person who had fired the shot and that the co-defendant had nothing to do with the shooting. Further, Curtain testified that he later learned that appellant's brother, Clint Walker, was the person who shot Steele and Smith. Neither of the defendants testified.

Two errors are assigned for review:

"I. The appellant was denied his Sixth Amendment right to confrontation by the trial court's refusal to grant his motion for separate trial."

Appellant argues that there was only one unequivocal statement that appellant was the gunman, *i.e.*, the testimony of the detective that the co-defendant said appellant fired the shot. We disagree.

The record revealed that the state asked for and was granted a voir dire examination outside the presence of the jury of witnesses Steele and Smith, the front occupants of the car, in view of information that they were about to change their testimony.

Smith clung to his story that appellant did not shoot him. On the other hand, Steele recanted his earlier in-court testimony now claiming that it was not appellant who shot them.

To make the record complete and official, the jury was reconvened to hear the voir dire testimony given in its absence.

Smith repeated his testimony that he did not see who shot him and Steele.

Steele was then scheduled to give his voir dire testimony to the jury. In his absence, his testimony was read to the jury.[1] In response to our court's inquiry as to Steele's unavailability, appellant's counsel in open court and without objection from the state, reported that the trial judge ordered the police to pick up the absent Steele forthwith to testify on his voir dire

---

**1.** Assuming that Steele legally qualified as an "unavailable" witness, it is insufficient to read his statement to the jury revealing his repudiation of his identification outside the presence of the jury, without also revealing his refusal to validate the repudiation in the presence of the jury.

testimony. However, Steele refused to return. So entrenched was his refusal that, in the ensuing confrontation with police, Steele was shot.

In effect, Steele never recanted for the record. His refusal to validate his voir dire recantation to the jury, notwithstanding the order of the court that he return, was tantamount to Steele's repudiation of his voir dire recantation leaving his earlier in-court accusation of appellant intact, thus rendering *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, no longer at issue.

## A

At the outset we reject the state's contention that appellant withdrew his motion for separate trials. Our review of the record reveals no such representation by defense counsel. Absent an express ruling on the motion and the fact that trial proceeded against both defendants, we shall presume it was denied. See *State v. Long* (May 26, 1988), Cuyahoga App. No. 53537, unreported, at 2, 1988 WL 86436; *Solon v. Solon Baptist Temple, Inc.* (1982), 8 Ohio App.3d 347, 351–352, 8 OBR 458, 462–463, 457 N.E.2d 858, 863–864.

If the court denies a defendant's motion for separate trials, the defendant must demonstrate on appeal that the denial of the motion was prejudicial to him, thereby affecting his right to a fair trial. *State v. Bland* (Mar. 13, 1980), Cuyahoga App. No. 41025, unreported, at 5. However, appellant waived any error in this regard by failing to renew his motion at the close of the state's case or at the conclusion of all the evidence. *State v. Owens* (1975), 51 Ohio App.2d 132, 5 O.O.3d 290, 366 N.E.2d 1367, paragraph two of the syllabus; *State v. Booker* (May 26, 1988), Cuyahoga App. No. 53961, unreported, at 8, 1988 WL 86417; *State v. Gindlesperger* (Jan 31, 1985), Cuyahoga App. No. 48327, unreported, at 6, 1985 WL 17707. Generally, a waiver precludes an alleged error from being raised on appeal unless the error amounts to plain error under Crim.R. 52(B). *Id.; State v. Swanson* (1984), 16 Ohio App.3d 375, 377, 16 OBR 430, 432, 476 N.E.2d 672, 675.

## B

Appellant contends that the admission of testimony concerning co-defendant Cannon's out-of-court statement violated his Sixth Amendment right to confrontation, as expressed in *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. This issue has already been discussed earlier in our treatment of Steele's refusal to repudiate to the jury his alleged recantation in voir dire proceedings making *Bruton* inapplicable.

The first assignment of error is overruled.

"II. The appellant was denied his right to due process of law when the trial court failed to grant appellant's motion to dismiss on grounds of tainted identification."

■ Appellant argues the court abused its discretion by failing to dismiss the case. Appellant argues that the totality of the circumstances indicates that Steele's original identification of the appellant was tainted. We do not agree.

Steele knew appellant prior to this incident. As a matter of fact, appellant and his cousin, co-defendant Cannon, Jr., in the past had gone to Steele's house to eat together.

Since Steele identified appellant as the one who shot him, the police brought him a photo of defendant to make sure that this was the individual Steele was talking about.

There was no effort to persuade Steele or talk him into identifying the defendant.

Discretion is abused when a decision is arbitrary, fanciful, or unreasonable, or only when no reasonable man would take the view adopted by the trial court. *Sgro v. McDonald's Restaurant* (1984), 21 Ohio App.3d 41, 21 OBR 43, 486 N.E.2d 157, paragraph two of the syllabus; *Pembaur v. Leis* (1982), 1 Ohio St.3d 89, 91, 1 OBR 125, 126, 437 N.E.2d 1199, 1201; *Steiner v. Custer* (1940), 137 Ohio St. 448, 19 O.O. 148, 31 N.E.2d 855, paragraph two of the syllabus. We find no abuse of discretion here. Assignment of Error II is overruled.

In reviewing the record, we note that this was an unusual trial involving an identification, a recantation, a repudiation of that recantation, etc. Therefore, we find the testimony of the investigating officer crucial as will be noted by the following:

### DIRECT EXAMINATION OF GREGORY CURTIN

BY MR. JAMES [Prosecutor]:

"Q. Detective, would you state your full name and spell your last name for the record.

"A. Gregory Curtin, C-u-r-t-i-n.

"Q. By whom are you currently employed?

"A. City of Warrensville Heights Police Department.

"Q. What do your duties consist of, sir?

"A. Right now, I'm in the Detective Bureau * * *."

"Q. Did you find anything in either vehicle?

"A. In the blue vehicle [2] before searching, I noticed a brown paper bag with—next to the bag was a .38–caliber live round sitting on the, it would be the passenger floor-board, and then when we searched the car, it was found that the bag contained, I can't remember how many bullets, but there were numerous .38 rounds in it, .38 bullets, .38–caliber.

"Q. During the course of your investigation, you never found a gun, right?

"A. No, I was unable to locate the weapon.

"Q. Did you eventually find Mr. Walker?

"A. Yes.

"Q. Did you place him under arrest?

"A. Yes, he was placed under arrest." (Footnote added.)

### CROSS–EXAMINATION OF GREGORY CURTIN

BY MR. BRADLEY [Counsel for Clement Cannon, Jr.]:

"Q. Mr. Cannon told you he originally went over to Walford Avenue to talk to Steele, is that correct?

"A. That's correct.

"Q. And Mr. Cannon told you that he didn't know anything about the gun, didn't know anything about anyone shooting, didn't know anything about it; is that correct?

"A. The first interview, that's correct.

"Q. And then you must have asked him whether or not he had a gun or whether he had assisted somebody in shooting, and what did he say?

"A. He said he had nothing to do with the shooting.

" * * *

"Q. Showing you what is marked as Defendants' [Cannon] Exhibit 1, are you familiar with this statement?

"A. Yes, sir.

"Q. Does it say he took Clint Walker, he took Clint Walker?

"A. That is correct.

"Q. He told you he drove over to Clint Walker's?

"A. Right.

"Q. That's Dwayne Walker's brother, right?

---

2. Cannon's car.

"A. Yeah, his brother.

"Q. So, we have two things straight. Cannon told you that he drove over to talk to Steele about the altercation they had earlier, right?

"A. That's correct.

"Q. And when he drove over, he drove over with Dwayne Walker's brother Clint; is that correct? That's what he told you?

"A. Yes."

## CROSS–EXAMINATION OF GREGORY CURTIN

BY MR. LILLIE [Counsel for appellant Dwayne Walker]:

"Q. Detective Curtin, with respect to the arrest of Mr. Walker, he did not resist any arrest, did he?

"A. Dwayne Walker, no, sir.

"Q. With respect to the identification of Mr. Walker, it was first indicated to you, I think you testified, that Mr. Steele said that Dwayne Walker had shot him; is that correct?

"A. That's correct.

"Q. Did there come a time when you learned that in fact it was Clint Walker who had shot Mr. Steele?

"A. Yes, I did.

"Q. And did you in fact learn that today?

"A. Yes, I did, about 1:00 o'clock.

"Q. Can you tell us briefly without saying what Mr. Steele said, can you tell us how you found this out?

"MR. JAMES: Objection, Your Honor.

"THE COURT: Sustained.

"* * *

"Q. Detective Curtin, just a couple more questions. You testified that you originally understood that it was Dwayne Walker who had been the gunman; correct?

"A. That's correct.

"Q. Then you testified that you later found out that it was not Dwayne, but rather his brother Clint?

"MR. JAMES: Objection, Your Honor.

"THE COURT: Sustained.

"Q. Can you please tell us how you found out that Dwayne Walker was not the gunman in this?

"MR. JAMES: Objection, Your Honor.

"THE COURT: Sustained.

"* * *

"Q. Detective Curtin, you testified that at 1:00 o'clock today you found out that Dwayne Walker was not the gunman?

"MR. JAMES: Objection, Your Honor.

"THE COURT: Sustained.

"Q. Can you tell us who you spoke with at 1:00 o'clock?

"A. Spoke with the victims James Smith and Darryl Steele.

"Q. And subsequent to that conversation, was it your understanding that Dwayne Walker was not the gunman?

"MR. JAMES: Objection.

"THE COURT: Sustained.

"Q. Detective Curtin, could you explain to us what caused you to understand that Mr. Walker was not the gunman?

"MR. JAMES: Objection.

"THE COURT: Sustained, Mr. Lillie:

"MR. LILLIE: May we approach the bench, Your Honor?

"* * * *

"Q. Detective Curtin, could you tell us if you had occasion to engage in additional investigation following the July investigation?

"A. Yes.

"Q. And subsequent to your July investigation, did you have occasion to have conversations with Mr. Steele and Mr. Smith?

"A. Yes.

"Q. As a result of one of those conversations, did you change your conclusions relative to your investigation?

"MR. JAMES: Objection, Your Honor.

"THE COURT: Sustained.

"MR. LILLIE: Nothing further, Your Honor.

"THE COURT: Mr. James.

"MR. JAMES: No redirect, Your Honor.

"THE COURT: You can step down. Call your next witness, please, Mr. James.

"MR. JAMES: Your Honor, may I approach the bench for half a second? We have no further questions."

In evaluating this testimony, it is important to note that Curtin was the investigating officer. He was not just another witness. He was in charge of the investigation from the beginning and more familiar with the case than any other witness. He had no ax to grind, or side to favor. He represented the executive arm of the state responsible for the apprehension of criminals. It was his duty to take statements from witnesses who either saw the shooting or had information relative to the assault. Based on this investigation, he arranged for the witnesses to appear before the grand jury who returned an indictment charging Dwayne Walker and his cousin/co-defendant Clement Cannon, Jr. for felonious assault with gun and violence specifications.

However, after hearing testimony in court under oath, additional questioning of the victims and conducting a further investigation, Officer Curtin believed that the wrong Walker has been indicted.

Unfortunately, the justification for change in the officer's position was not allowed to come before the jury who carried the burden of rendering a just verdict. The efforts of appellant's counsel were thwarted by the objections of the state. Nor did appellant's counsel register exceptions to the court's ruling to preserve appellant's right on appeal. An explanation of the change in the officer's opinion was essential for the jury to consider in deliberating its verdict. Whether the jury accepted that explanation is for it to decide. A trial is not a game between two contestants, but a search for the truth. That search is as much a responsibility for the state and the defense as it is for the court.

■ Although not assigned as error, we conclude that the failure to allow the officer to explain and justify to the jury why he believed that the appellant is not the one who shot the victims rises to the level of plain error.

In short, substantial rights of the accused were so adversely affected as to undermine the fairness of the guilt-determining process. *State v. Swanson* (1984), 16 Ohio App.3d 375, 377, 16 OBR 430, 432, 476 N.E.2d 672, 675.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for further proceedings.

*Judgment reversed*
*and cause remanded.*

528

ANN McMANAMON, J., concurs.

NAHRA, P.J., dissents.

AUGUST PRYATEL, J., retired, of the Eighth Appellate District, sitting by assignment.