JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Elven A. Finger, Jr. ("Finger"; d.o.b. October 22, 1960) appeals from his jury trial convictions of three counts of felonious assault (R.C. 2903.11), with firearm specifications (R.C.2941.145) and specifications for having discharged a firearm from a vehicle (R.C. 2941.146). For the reasons adduced below, we affirm in part and reverse in part.[1]
 {¶ 2} A review of the record on appeal indicates that the offenses in issue occurred at approximately 2:00 p.m. on July 12, 2001 in the vicinity of East 117th Street and Luke Avenue in the Buckeye neighborhood of the City of Cleveland. At that time, two gunshots were reported. The source of the shooting was disputed by the parties.
 {¶ 3} At trial, it is not disputed that Finger, a carpet installer, was driving his full-size Chevrolet van as he dropped off his passenger and employee, Malik Shabazz, at Shabazz's residence which was near the intersection in question. The testimony concerning other events differs.
 {¶ 4} The first witness for the state, Cleveland Police Officer James McPike, testified that he was in his patrol car with his partner, Officer Robert Simon, around the time of the gunshots, investigating a citizen's complaint of drug trafficking at the intersection of East 117th Street and Luke Avenue. As the witness's patrol car traveled with its windows down on Luke Avenue approaching the intersection in question, the witness heard two gunshots and observed Finger's van parked at an angle on the wrong side of the street and people fleeing the scene on foot. The witness then observed the van leave the scene at a high rate of speed, squealing its tires, heading north on East 117th Street. The officers then activated their siren and flashing lights and followed the van at high speed. The officers lost sight of the van for several seconds as the van made a right-hand turn and proceed eastbound onto Ely Avenue. After the pursuing officers turned the corner, the van came to an abrupt stop near the intersection of East 118th Street and Ely Avenue after slamming on its brakes. The stopping of the van was so sudden that the pursuing patrol car almost collided with the rear end of the van. Tr. 223-224, 284-285. Finger then "dove out of the van face down on to the pavement with his hands out to his side" in the middle of the street. Tr. 224-225. The officers exited their patrol car with guns drawn, handcuffed Finger, performed a pat-down search on Finger for weapons and asked Finger what happened.
 {¶ 5} Officer McPike stated that Finger claimed to have been shot at and that he had sped away to avoid being shot. Tr 225-226. Finger was then placed into the back seat of the patrol car.
 {¶ 6} While the officers were at the scene of the stopped van, they were approached by two citizens, an older male who was very agitated and a teenage male, both of whom claimed that they had just been shot at by Finger. Officer McPike asked these two males whether the man in the back seat of the patrol car (Finger) was the shooter; both males, without hesitation, responded affirmatively. Tr. 227. After conversing with fellow officers who had arrived on the scene as supporting units, Officer McPike placed Finger under arrest and advised him of his constitutional rights. Finger continued to profess his innocence after being arrested and read his rights, claiming that he had gotten into a verbal altercation with a man, Mr. Caywood, at the intersection when someone pulled a gun and started shooting at Finger. Finger denied ever having a gun. An inventory search of the van noted that both front windows were open. Tr. 232.
 {¶ 7} Approximately ten minutes after stopping the van an unnamed citizen told the police that a gun was under some bushes nearby. These bushes were approximately fifty feet from the stopped van. Tr. 285. Officer Simon went to the indicated location, which was along the route of flight used by the van, and observed a small Charter Arms .38 caliber revolver in the bushes, and the two wooden handle grips, in three separate pieces, nearby. Tr. 233, 254-256. The bushes were on the right hand side of the road. See Tr. 271. One of the wooden grips was found on the sidewalk. Tr. 251. The remaining grip had broken into two pieces. Tr. 293. There was a scrape mark on the sidewalk adjacent to the bushes where the firearm was found, indicating to Officer McPike that the revolver, after being thrown, had hit the sidewalk causing the revolver's handle grips to shatter and break free of the weapon. The scrape mark on the sidewalk appeared to be freshly made. Tr. 253. Officer McPike found five cartridges inside the revolver's cylinder; two of those cartridges had been fired. Tr. 255-256. The police also recovered a spent bullet found in the vicinity of the intersection where the shootings occurred. The police department's scientific investigation unit ("SIU") photographed the revolver and its grips on the ground prior to this evidence being gathered up and removed from the scene.
 {¶ 8} Officer McPike then returned to his patrol car and informed Finger that they had found the gun. According to Officer McPike, Finger, who had been agitated up to that time, "didn't say anything at that point. Nothing. Before he just wouldn't stop talking about how innocent he was, now he was not saying anything. * * * his demeanor changed because he just kind of sat back and didn't say anything." Tr. 235.[2]
 {¶ 9} Thereafter, Officer McPike and his partner drove Finger to Police Headquarters at the Justice Center. While en route, Finger allegedly engaged Officer McPike in conversation, asking the officer how long he would get for the crime in question. Tr. 237-238. When the officer informed Finger of the possible punishment, Finger allegedly stated to Officer McPike that, "it would have been worth it if I killed one of those little niggers." Tr. 238. Officer Simon wrote this phrase down so that he could include it in the official police report. Tr. 238-239. When asked what he meant by this statement, Finger told Officer McPike that he "was upset about getting respect." Tr. 239. Also while en route, while Finger was making a call on his cellular telephone (with police permission), Officer McPike overheard Finger tell the person on the phone that he had shot the windows out of the car. Tr. 242.
 {¶ 10} On cross-examination of Officer McPike, the defense sought to develop the theory that the gun could have been deposited at the location by a person other than Finger since the police did not see Finger with a weapon and did not, during the period of time when the van was visible to them during the chase, observe him throw the weapon from the van. Officer McPike also admitted that the scrape on the sidewalk, while unweathered, could have been caused by an object other than a gun. Finally, Officer McPike was questioned on cross-examination about the statements Finger allegedly made while in the officer's presence. Tr. 276-278.
 {¶ 11} On redirect examination, Officer McPike testified that the revolver in question had a few scrapes on it where the handle had shattered, and a piece of metal had been scraped away from the corner of the handle. Tr. 286.
 {¶ 12} On re-cross examination, Officer McPike added that scrape marks showing bare metal were also present on the trigger guard of the weapon. Tr. 291-292.
 {¶ 13} The second witness for the state was Mr. Gerald A. Osborn, who lived three houses from the intersection where the shooting occurred. Osborn testified that he was at the intersection in question at the time of the shooting doing some exterior masonry work beside the entrance steps at Mrs. Caywood's house on Luke Avenue, right at the intersection of East 117th Street. Osborn observed the van, playing loud music, pull up on the other side of Luke Street and a man exit the van. As the man exited the van the driver turned down the music at which time Osborn heard the driver say that, "niggers on 117th going to have to respect me. They don't have no respect for me." Tr. 299, 318. These comments by Finger, according to Osborn, were being directed at Oscar Caywood who was repairing his Honda Civic near the intersection. Tr. 301. Finger then turned and allegedly engaged Osborn, who was looking at Finger, in conversation, calling Osborn an old fool and demanding to know what he was looking at. Tr. 302-303. Osborn, in reply, waived his hand at Finger and turned around. At that point, Osborn heard the van pull up to a stop sign at the intersection of East 117th Street and Luke Avenue, which was adjacent to Osborn's position, and then heard someone shout, "Oscar, oh, my, God." Tr 303. Osborn, a Vietnam combat veteran who served in the U.S. Marines Corps was less than twelve feet from the van at that moment, turned around quickly in the direction of the van and observed Finger pull out a gun with his right hand, lean out of the van, and fire two rounds in the direction of Osborn and Caywood. Tr. 304-305, 354-355. At least one of the rounds went through a window of Caywood's Honda Civic which was nearby, shattering the window before exiting the Honda and bouncing off a masonry wall which Osborn had freshly mortared, coming to rest on the ground nearby. Osborn and Caywood ducked for cover behind the front end of the Honda Civic. The van then fled as a police car approached the intersection and engaged in a hot pursuit of the van. According to Osborn, the only person seen with a gun at the time was Finger. Tr. 321.
 {¶ 14} Osborn and Caywood later approached the stopped van, saw Finger in the back seat of the patrol car, and identified Finger to the police as the shooter.
 {¶ 15} On cross-examination, Osborn stated that he was approximately 25 to 30 feet from the van when the shots were fired. Tr. 331. Osborn, who admitted to having had a felony record and a personal struggle with crack cocaine usage, also testified that there was a lot of drug activity in the neighborhood. Tr. 334. He did not know if Oscar Caywood sold drugs. Tr. 340.
 {¶ 16} The third witness for the state was Mr. Sean M. Fuqua, a high school-age male who testified that at the time of the offenses herein he was at the scene of the intersection on a lunch break with Oscar Caywood, helping Caywood with repairs to Caywood's Honda Civic at Caywood's home. Tr. 362. Fuqua testified that he was seated in the front passenger seat of Caywood's Honda when Finger drove up, dropped off a passenger, and began arguing with Caywood. Fuqua then exited the Honda and tried to convince Caywood to break off the confrontation, telling him it wasn't worth it. Caywood then returned to tending to the car repairs, at which time Finger pulled his van up to the stop sign. After several seconds, Fuqua, who was standing on the sidewalk adjacent to the passenger side of the Honda and had seen Osborn on the scene doing masonry work, observed Finger leaning out of the van and heard shots fired from the area of the van. Tr. 383, 388. Fuqua did not attempt to see a gun, and did not see a gun in Finger's hand. Tr. 375. Fuqua heard the name Max Fluker spoken just before the gunshots rang out. Glass from the shattered rear window on the Honda struck Fuqua. Fuqua then began to run in the direction of a nearby backyard as the van fled the scene.
 {¶ 17} Fuqua denied having a gun at the time of the shooting. He also stated that Caywood did not have a gun. Tr. 389.
 {¶ 18} On re-cross examination, defense counsel attempted to infer that unknown persons, who could have fired the shots, could have been in another area of the intersection. However, Fuqua discounted this theory by stating, "[B]ut when I was looking that way there was nobody around. There was no one around." Tr. 391.
 {¶ 19} The fourth witness for the state was Mr. Oscar Caywood, a high school-age male who corroborated the testimony of the other eyewitnesses to the shooting. Caywood testified, in particular, that Finger was making comments concerning getting respect in the neighborhood, grew angry when Caywood called for his friend to go get Caywood's uncle, Max Fluker. Finger then reached his arm out of the van at the stop sign and Finger had a gun in his hand. Tr. 407, 418, 423, 435-436. Caywood described the gun as "black," that he dove for cover behind the Honda when he saw the gun, that he then heard two gunshots and the sound of squealing tires as the van began to leave the scene at high speed. Tr. 408-410, 429-430. Caywood observed the police, who had just arrived on the scene, give chase to the fleeing van. Caywood stated that no one on the scene, himself, Fuqua, or Osborn, had a gun. Tr. 412. The only gun Caywood saw that day was the one used by Finger. Tr. 413. Caywood, at the scene of the stopped van, identified Finger to the police as the shooter. Tr. 414. Caywood also denied ever making critical statements to Finger, and denied trafficking in drugs. Tr. 422, 431-432.
 {¶ 20} The fifth witness for the state was Mr. Lloyd Stewart, who testified that at the time of the shooting he was sitting with his sister, Aieren Stewart, on his front porch on East 117th Street, across the street from Caywood's house and two houses from the intersection with Luke Avenue, approximately 40 feet from the van at the time of the shooting. Stewart observed the van pull up playing loud music, the passenger being dropped off, words being exchanged between Finger and Caywood, Finger firing a gun directly at Caywood, and the van flee the scene at high speed. With the firing, Stewart ducked for cover and told his sister to call the police. Stewart also observed the police come on the scene shortly after the shooting and give chase to the van.
 {¶ 21} With the cooperation and guidance of the police, Stewart, and others, then went looking for the gun used in the shooting. Stewart found a broken handle grip and the handle of the gun in the bushes and pointed it out to the police; he did not touch the grip or the gun. Tr. 453-454.
 {¶ 22} Stewart testified on cross-examination that he never saw Caywood, Fuqua, or Osborn sell drugs. Tr. 463.
 {¶ 23} The sixth witness for the state was Ms. Aieren Stewart, an eyewitness to the shooting who generally corroborated the testimony of her brother, Lloyd Stewart. Ms. Stewart also added that she saw Finger use a black-colored gun, but could not say precisely how many shots were fired. Tr. 470-471. She saw Finger pull out the gun and fire the first shot, but she only heard the second shot. Tr. 476-477, 481. She saw no one else, beside Finger, with a gun. Tr. 471. After the first shot she ran inside the house and telephoned the police.
 {¶ 24} The seventh witness for the state was Cleveland Police Officer Robert Strollo. Shortly after the shooting, in response to a radio dispatch, he responded to the scene in his patrol car. At the scene, he observed Caywood's Honda Civic which had the rear window shot out, the bullet exiting through the rear passenger door window. While searching the area for evidence, and using the flight of the bullet through the Honda as a guide, he located one of the fired bullets embedded in a tree root on the ground near the masonry wall which was being repaired by Osborn.
 {¶ 25} The eighth witness for the state was Cleveland Police Officer Robert Simon, who corroborated the earlier testimony of his partner, Officer McPike, and the testimony concerning the finding of the shattered firearm. Officer Simon also testified that he found some of the revolver's pieces and observed the freshly made scratches on the sidewalk a few feet from the weapon, which were in line with the nearby weapon. Tr. 531-532, 556-557. Officer Simon stated that the statement made by Finger while being transported downtown was not prompted by the police, concerning the shooting being worth it had he killed one of the victims and that he admitted that he shot the car window, that it was volunteered by Finger. Tr. 535-539. Officer Simon included these incriminatory statements in his police report.
 {¶ 26} The ninth witness for the state was Cleveland Police Officer John Hudelson. Shortly after the shooting, in response to a radio dispatch, he responded to the scene in his patrol car with his partner, Officer Toomey. At the scene he and his partner were asked to help search the area for evidence. He observed Officer Simon locate the firearm and saw the fresh scratches on the sidewalk. Officers Hudelson and Toomey were then tasked with securing the area so that nothing would be disturbed prior to the evidence being gathered up by the SIU. Officer Hudelson observed the SIU unload the revolver and disclose two spent .38 caliber cartridges in the cylinder. Tr. 569.
 {¶ 27} The tenth witness for the state was Cleveland Police Detective Andre Douglas, who investigated the shooting scene as part of the SIU and documented and processed the physical evidence located there. Detective Douglas dusted the revolver and the five cartridges contained in the cylinder of the weapon for fingerprints. Two of the cartridges had been fired. A latent print was recovered from the side of the revolver, but he later learned that further investigation concluded there was no value to the print because it was not linked to anyone on file. Detective Douglas, on cross-examination, opined that the evidence (shattered pieces from the firearm, fresh scratches on the sidewalk near the weapon, and bare metal areas on the revolver from a possible abrasion) appeared to indicate that the revolver had been thrown. Tr. 591-592.
 {¶ 28} The eleventh witness for the state was Mr. Victor Kovacic, a civilian superintendent of criminalistics of the forensic unit at the SIU who is a retired Detective-Sergeant of the Cleveland Police Department. He successfully test fired the Charter Arms .38 caliber revolver found at the scene with one of the three unfired cartridges found in the weapon and determined that revolver was operable. The markings left on the test bullet matched the markings found on the bullet recovered from the shooting scene, indicating that the revolver had fired the bullet recovered from the scene. Tr. 618-622, 624, 629.
 {¶ 29} The twelfth witness for the state was Ms. Felicia Wilson, a fingerprint examiner for the SIU. She examined the latent print found on the revolver and could not obtain a match with any individual then on file, rendering the print to be unusable.
 {¶ 30} The thirteenth witness for the state was Cleveland Police Detective Joseph Daugenti, who was assigned to investigate the shooting in question. During his investigation he viewed the evidence and the reports of the officers and SIU, interviewed the eyewitnesses and Finger's former girlfriend, and presented the matter to the prosecutor's office for consideration by the grand jury.
 {¶ 31} The state then rested its case subject to the admission of exhibits. Tr. 695. The court then addressed the admission of exhibits into evidence. Following this, the defense, in cursory fashion, moved for acquittal pursuant to Crim.R. 29. This motion was denied. Tr. 703-705.
 {¶ 32} The first witness for the defense was Mr. Anthony Ciresi, an owner of a carpet retail store who had employed Finger as an independent contractor carpet installer. Ciresi testified that on the day after the shooting, Finger telephoned him asking for help in making bail. From the tone of Finger's voice, Ciresi did not think the matter was too serious. Ciresi considered Finger to be a good, dependable worker, he never saw Finger with a gun, and did not know Finger to be violent.
 {¶ 33} The second witness for the defense was Finger's aunt, Ms. Dolores Walton, who testified that Finger telephoned her from the police car after the shooting and asked her to come down to where he was being held. She does not know if hers was the only telephone call placed by Finger while in custody. Finger had already been transported from the scene by the time she arrived there. She had never known Finger to have a gun.
 {¶ 34} The third witness for the defense was Finger who, apart from detailing his six-year service in the U.S. Navy[3], employment history, and associate's degree in college, generally denied firing the shots on the date of the offense.
 {¶ 35} Finger claimed that approximately fifteen minutes prior to dropping off Mr. Shabazz, prior to getting to the intersection of the shooting, he telephoned the police and complained of drug trafficking activity on the corner of east 117th Street and Luke Avenue. However, Finger did not see any such activity at the time of making that call. Tr. 849-850. He claimed that he had made repeated complaints of drug activity in the past at that intersection and had observed this activity on numerous occasions, at times being approached and wrongly solicited as a potential drug purchaser.
 {¶ 36} Finger then testified that he was playing music loudly inside the van when he arrived on the scene. At that point, Caywood allegedly approached the van complaining of the loud music while using profanity. Finger responded to Caywood telling him that he needed to show some respect for his elders. Tr. 788. Caywood then allegedly continued using intemperate remarks against Finger, and Finger responded by threatening to exit the van and put Caywood over his knee and spank him. Finger denied speaking to Osborn. Tr. 857. After making this threat of a spanking to Caywood, Finger testified that he heard two gunshots come from the northwest corner of the intersection near a line of trees, across the street from the van position. Tr. 789, 813, 860-862. At the time of the gunshots, Finger observed four people on the street, namely, Caywood, Osborn, Fuqua, and Shabazz, but did not see who fired the shots. Tr. 814, 869-870. Finger then claimed he became scared and fled the scene in the van, turning up the same street into the direction from where heallegedly heard the gunshots. See Tr. 863-864.
 {¶ 37} As he fled, Finger stated that he saw police at the intersection of East 117th Street and Luke Avenue as he made a right-hand turn at the corner of Ely Avenue. Tr. 790. He claimed that the police turned the corner onto Ely Avenue right behind him at essentially the same time as him, not following him a block behind when he made the turn. Tr. 863-864. The police were coming so fast that Finger believed they were coming after him, so he traveled the entire city block before pulling over at the stop sign at East 118th Street and Ely Avenue. Tr. 791, 866-867. It was Finger's contention that the police were so close behind him that they could never have lost sight of the van. Tr. 797. Finger then jumped out of the van and laid spread eagle on the pavement so as to demonstrate that he was not a threat to the police. Tr. 792-793.
 {¶ 38} The police then handcuffed Finger and placed him into the rear seat of the patrol car. According to Finger, the police found on his person money, a cellular telephone, and some marijuana which his cousin gave him; he did not consider marijuana to be a drug. Finger explained to the police that he was fleeing because someone was shooting at him. Finger testified that he was advised of his rights more than an hour later after the revolver had been found. Tr. 793-794.
 {¶ 39} Finger stated that he telephoned his aunt while being detained in the back seat of the patrol car at the scene of the stop. Tr. 798-799. While being transported to downtown police headquarters he made two telephone calls to his sister, Robin Finger, during which he told her that someone had started shooting while he was dropping off his friend, that he was being arrested, and that he needed help in making bail. Tr. 799, 801. While en route to the downtown police station, Finger claimed that he also telephoned a carpet client, Mrs. Davenport, and discussed business.
 {¶ 40} While being transported, he denied shooting any gun and allegedly complained to the police about why they were not arresting the people who found the gun. Finger also denied making the statement that he had shot out the windows on the Honda. Tr. 880. He claimed that he told the officers that "I wish I had did it because you all arrested me for it," and denied saying killing one of the eyewitnesses on the street would have been worth it. Tr. 881-882.
 {¶ 41} On cross-examination, Finger, despite stating on direct examination that he had never been in trouble before and having friendly relations with his former girlfriend, admitted to pleading guilty to a charge of telephone harassment committed the same morning as this shooting against his former girlfriend. Tr. 885-887. There was some evidence that Finger's former girlfriend was, at the time of the shooting, the girlfriend of Caywood's uncle, but Finger claimed that this situation did not upset him.
 {¶ 42} Further on cross-examination, Finger claimed that someone had "planted" the revolver in the bushes where it was found. Tr. 895-897.
 {¶ 43} The fourth, and final, witness for the defense was Detective Daugenti, who testified concerning a bench warrant being issued by the trial court to secure the attendance of Shabazz as a witness for the defense, and the execution of that warrant. While executing the warrant the detective learned that Shabazz had moved from the location and his girlfriend, who had consented to the search of the apartment, did not know where Shabazz had gone.
 {¶ 44} At that point the defense rested and renewed its motion for acquittal. Tr. 915. Without argument by the parties, the trial court denied the motion without elucidation.
 {¶ 45} The court then gave instructions to the jury. Tr. 917-935. The state then made its closing argument. Tr. 935-951. The defense made its closing argument. Tr. 951-959. The state then made its rebuttal argument; no objection was raised by the defense during rebuttal. Tr. 960-966.
 {¶ 46} The court then concluded its instructions to the jury. Tr. 966-971. The parties, when asked by the court, were satisfied with the jury instructions. Tr. 968, 971.
 {¶ 47} While the jury was deliberating, the court received a question from the panel. With both counsel present, the court read the question which was whether the jury could listen to the audiotape of the 911 call made by Ms. Stewart and see the police report of the arresting officers. Tr. 972. The court answered the question in the negative.
 {¶ 48} The jury returned its guilty verdicts which were read in court. Tr. 974-978. Subsequent to the preparation of a presentence investigation report and a separate sentencing hearing, the court sentenced Finger to, in total, a term of eight years.
 {¶ 49} Finger presents six assignments of error for review.
 {¶ 50} The first assignment of error states the following: "Mr. Finger was denied federal and state due process of law by the prosecution's introduction of evidence of his post-miranda silence."
 {¶ 51} In this assignment appellant argues that the "State introduced evidence of his change in demeanor when, upon being confronted with what the police believed to be additional evidence, Mr. Finger remained silent." Appellant's brief at 8. Appellant relies on the authority of Doyle v. Ohio (1976), 426 U.S. 610, 619, which held that "the use for impeachment purposes of petitioner's silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."
 {¶ 52} The alleged error concerning Finger's post-Miranda demeanor occurred during the state's direct examination of Officer McPike:
 {¶ 53} "Q. And so you secure or they secured, those two other officers secured the scene. What were you doing while they were securing the scene?
 {¶ 54} "A. I went over and opened the car door. I told Mr. Finger, I said, we found the gun. And I just pretty much was telling him we found the gun. He didn't say anything at that point. Nothing.
 {¶ 55} "Before he just wouldn't stop talking about how innocent he was, now he was not saying anything.
 {¶ 56} "Q. Did his demeanor change, the way he was acting?
 {¶ 57} "A. I would say his demeanor changed because he just kind of sat back and didn't say anything.
 {¶ 58} "Q. Went from, what was it like before you told him you found the gun?
 {¶ 59} "A. A little agitated. Like I said, he was saying they are lying on me. They were shooting at me and now all of a sudden he sat back in the seat and was quiet and didn't say anything." Tr. 235.
 {¶ 60} The record further reflects that the defense failed to object to this line of questioning. This failure to object waives all but plain error. See Crim.R. 52(B); see, also, State v. Walker (1990),66 Ohio App.3d 518, 522, 585 N.E.2d 848; State v. Brady (1988),48 Ohio App.3d 41, 44, 548 N.E.2d 278; State v. Owens (1975),51 Ohio App.2d 132, 146, 5 Ohio Op.3d 290, 366 N.E.2d 1367. "An appellate court reviewing a proceeding for plain error must examine the evidence properly admitted at trial and determine whether the jury would have convicted the defendant even if the alleged error had not occurred. Statev. Slagle (1992), 65 Ohio St.3d 597, 604-605, 605 N.E.2d 916. `Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice.' State v. Long (1978), 53 Ohio St.2d 91, 7 Ohio Op.3d 178,372 N.E.2d 804, paragraph three of the syllabus." State v. Saade, Cuyahoga App. Nos. 80705 and 80706, 2002-Ohio-5564, at ¶ 13, 2002 Ohio App. LEXIS 5571 at 7. Thus, in order to sustain Finger's convictions herein, we must conclude that the alleged Doyle error was harmless beyond a reasonable doubt. Chapman v. California (1967), 386 U.S. 18; State v.Williams (1983), 6 Ohio St.3d 281, 6 OBR 345, 452 N.E.2d 1323, paragraph three of the syllabus. In Williams, the Ohio Supreme Court stated that "such error is harmless beyond a reasonable doubt if the remaining evidence, standing alone, constitutes overwhelming proof of defendant's guilt." Id. at paragraph six of the syllabus.
 {¶ 61} In the present case we conclude that the remaining evidence of guilt, which includes five eyewitnesses to the shooting and physical evidence which indicates that the revolver, with fresh scratches to the firearm and the nearby sidewalk, was thrown from the fleeing van, was overwhelming proof of Finger's guilt. Thus, harmless error applies to the purported Doyle violation presented in this assignment.
 {¶ 62} The first assignment of error is overruled.
 {¶ 63} The second assignment of error states the following: "The trial court plainly erred when it instructed the jury that it could find that Mr. Finger could attempt to inflict physical harm upon his victims even where he did not intend to cause harm to them." Appellant's brief at 10.
 {¶ 64} The trial court instructed the jury relative to the felonious assault offenses, that it must be shown beyond a reasonable doubt that "the defendant knowingly caused or attempted to cause physical harm to the following victims by means of [a] (sic) deadly weapon or dangerous ordinance, to wit, a firearm." Tr. 925. The court next defined the elements of a felonious assault offense, and the elements of the firearm specification for discharging a firearm from a vehicle which includes finding that the defendant "purposely or knowingly causing or attempting to cause death or physical harm to another, and the offense was or was not committed by discharging a firearm from a motor vehicle other than a manufactured home." Tr. 925-929, 930. The court, reciting from OJI 409.01(2)-(5), then defined "purposely" thusly:
 {¶ 65} "A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to cause death or physical harm. That only relates to that one firearm specification.
 {¶ 66} "When the central idea of the offense is a forbidding of conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature regardless of what he may have intended to accomplish by his conduct. Purpose is a decision of the mind to do an act with a conscious objective of engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means, weapon used and all the other facts and circumstances in evidence." Tr. 930-931 (Emphasis added).
 {¶ 67} As noted by the parties the defense made no objection to these instructions.
 {¶ 68} In assessing the court's instruction, we are mindful that, "jury instructions must be viewed as a whole and will not be reversed if they, in their entirety make clear that the jury must find specific intent or purpose. Jordan, supra, 1999 Ohio App. LEXIS 1956, Jacks, supra, 60 Ohio App.3d 200, State v. Phillips (1995), 74 Ohio St.3d 711,656 N.E.2d 653; State v. Burchfield (1993), 66 Ohio St.3d 261, 262-263,611 N.E.2d 819." State v. Harris (Mar. 28, 2002), Cuyahoga App. No. 78519, 2002-Ohio-1406, 2002 Ohio App. LEXIS 1415 at 11.[4]
 {¶ 69} Appellant argues that the instruction may have confused the jury with what they had to find regarding Finger's specific intent. Construing the instruction as a whole, we do not join in appellant's speculation. The court clearly limited the intent finding between the felonious assault offenses and the firearm specifications. Furthermore, even if there was a hint of confusion, the lack of an objection waived all but plain error, the standard for which has been discussed earlier in this opinion. Under plain error, we cannot conclude that but for the error the outcome of the trial would have been different.
 {¶ 70} The second assignment of error is overruled.
 {¶ 71} The third assignment of error states the following: "The prosecution violated Mr. Finger's constitutional rights under Article I, Section 10 of the Ohio Constitution, the Fifth Amendment to the United States Constitution and the due process clause of theFourteenth Amendment to the United States Constitution when it engaged in improper comments in its opening statement and in closing argument." Appellant's brief at 11.
 {¶ 72} Appellant raises three instances of alleged improper comments by the prosecutor.
 {¶ 73} The first example of alleged improper commentary occurred during the state's closing argument: "You have heard where they were all standing. He is shooting right in the direction of them. And he is shooting from a distance of ten to 15 feet and you have got the pictures. You can make your own estimations. Thank God he misses them. Andthank God that (sic) Cleveland Police Department was rounding the cornerwhen the defendant did this, and that they were able to hear the pops andlook at the victims scatter. They all ran away. And you heard the testimony." Tr. 941-942 (Emphasis added).
 {¶ 74} There was no objection by the defense to this argument.
 {¶ 75} Appellant argues that the references to a hypothetical situation was an invitation to the jury "to think about what kind of case the instant case would have been had Mr. Finger not missed. This constituted an appeal to the jury based on an admittedly hypothetical scenario"; thereby diverting the jury from deciding the case on the facts which did occur. Appellant's brief at 13. Appellant then expands this "what if" scenario by referencing the use of an opening statement by the state where the prosecutor stated that "he fired two shots and could have killed any one of them or all of them." See Tr. 203. There was no objection by the defense to this opening statement comment.
 {¶ 76} Since there were no objections to these comments by the prosecutor, we are bound to analyze the matter under the plain error standard set forth earlier in this opinion. But for the alleged errors, we cannot conclude that the outcome of the trial would have been different.
 {¶ 77} The second example of alleged error under this assignment occurred at the very end of the state's rebuttal closing argument when the prosecutor made the following statement regarding an appeal to do justice for the victims: "There are three victims in this case who had no reason to come in here but seek justice and they did that. And I hope that when you go back and deliberate that you bring that justice there for them. That they didn't come in here and lose this case because somebody believed that there was a shooter in the grassy knoll." Tr. 965-966.
 {¶ 78} There was no objection by the defense to this statement. Under the plain error standard of review, we cannot conclude that, but for the alleged error, the outcome of the trial would have been different.
 {¶ 79} The third example of alleged error under this assignment occurred at the very end of the state's opening statement when the prosecutor commented as follows:
 {¶ 80} "All this evidence that you are going to hear, the testimony about how the things started, the shots that were fired, the physical evidence, the gun, the slug, where the gun was found, how it was found and what the defendant said both before and after the gun was found I think will demonstrate beyond a reasonable doubt that the defendant committed these crimes of felonious assault against these three victims who were all standing there, who were all in the area when he fired two shots and could have killed any one of them or all of them.
 {¶ 81} "Again, the State is focusing on the fact that he attempted to cause physical harm to these three individuals. I want to thank you for your patience. Hopefully at the end of this trial you will feel thesame way I do, that the defendant is guilty.
 {¶ 82} "Thank you, your Honor." Tr. 203 (Emphasis added).
 {¶ 83} As was the case with the other examples of commentary in this assignment, there was no objection to the prosecutor's personal expression of guilt. Further, it is interesting to note that at the very end of the opening statement of the defense, counsel for the defense, after generally denying Finger shot anyone, counters the prosecutor's opinion by expressing his own personal opinion about the inability of the state to prove the elements of the offenses: "Mr. Finger never had the gun, he never put it there. And I think from the testimony that you will hear that you will agree with me all the elements aren't there, theburden of proof isn't there. You will have to come to one conclusion, that Mr. Finger is not guilty of any and all of these charges." Tr. 208 (Emphasis added).
 {¶ 84} Under a plain error standard of review we cannot conclude that, but for the alleged error, the outcome of the trial would have been different.
 {¶ 85} The third assignment of error is overruled.
 {¶ 86} The fourth assignment of error states the following: "Mr. Finger was denied effective assistance of counsel in violation of theSixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Ohio Constitution." Appellant's brief at 14.
 {¶ 87} Appellant argues that his trial counsel was ineffective in failing to make timely objections, the nature of which were identified in the preceding assignments' plain error analysis, and in not requesting a limiting instruction from the trial court regarding police officer opinions that their decision to not test Finger's hands with a specific forensic procedure, which might show that Finger had recently held a metal object or fired a gun, was based on the "overwhelming nature of the evidence" arrayed against Finger. Appellant's brief at 14-15. Appellant argues that a limiting instruction would have prevented the jury from considering the police testimony of "overwhelming evidence," which was illuminated on cross-examination by defense counsel, as evidence of guilt.
 {¶ 88} This court recently stated the standard of review to be applied in assignments alleging ineffective assistance of trial counsel:
 {¶ 89} "Ineffective assistance claims are evaluated in a two-step process. First, the defendant must show that counsel's representation fell below an objective standard of reasonableness. State v. Keenan (1998),81 Ohio St.3d 133, 152, 689 N.E.2d 929, citing to Strickland v.Washington (1984), 466 U.S. 668, 688, 80 L.Ed.2d 674, 104 S.Ct. 2052. Second, the defendant must show that there is a reasonable probabilitythat, but for counsel's unprofessional errors, the result of theproceeding would have been different. Id. See also State v. Davie (1997),80 Ohio St.3d 311, 331, 686 N.E.2d 245 and State v. Reynolds (1997),80 Ohio St.3d 670, 674, 687 N.E.2d 1358. There is a strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy. State v. Hamblin (1988),37 Ohio St.3d 153, 524 N.E.2d 476. Even debatable tactics do not constitute ineffective assistance of trial counsel, for it is obvious that nothing is seen more clearly than with hindsight. State v. Clayton
(1980), 62 Ohio St.2d 45, 49, 16 Ohio Op.3d 35, 402 N.E.2d 1189. A reviewing court must evaluate trial counsel's performance on the facts of the particular case as of the time of counsel's conduct. Strickland, supra." (Emphasis added.) State v. Poole, Cuyahoga App. No. 80150, 2002-Ohio-5065, at ¶ 13, 2002 Ohio App. LEXIS 5111 at 7-8.
 {¶ 90} We conclude that appellant cannot demonstrate the second prong of the test for ineffective assistance of counsel since the result of the trial, but for the suggested errors, would not have clearly been different. Absent this showing of prejudice, we overrule the fourth assignment of error.
 {¶ 91} The fifth assignment of error states the following: "The trial court erred by failing to comprehensively instruct the jury following closing arguments."
 {¶ 92} In this assignment appellant takes no issue with content or adequacy of the instructions that were given to the jury. Instead, appellant simply takes issue with the timing of those instructions, arguing that Crim.R. 30(A) mandates that "the trial court shall give the jury complete instructions after the arguments are completed." No objection was made by the defense relative to the timing of the instructions. Also, appellant fails to mention what else the court could have added "after the arguments" so as to make complete the instructions.
 {¶ 93} A similar situation and argument arose in State v. Ross
(Sept. 20, 2001), Cuyahoga App. No. 78698, 2001 Ohio App. LEXIS 4187, appeal disallowed in (2002), 94 Ohio St.3d 1488, 763 N.E.2d 1185,2002 Ohio LEXIS 594. In Ross we determined that "absent objection, plain error would not be found where there is no challenge to the content of the instructions per se, but rather the challenge is to the order or format by which the instructions were delivered by the court." Id. 2001 Ohio App. LEXIS 4187 at 6. Here, the challenge is not to the content of the instructions but to the order of the instructions. Plain error is not demonstrated.
 {¶ 94} The fifth assignment of error is overruled.
[1] Judge Sweeney is writing the majority opinion on assignments of error 1 through 5 inclusive. Judge Celebrezze is writing the majority opinion on assignment of error 6.
[2] The defense did not object to this line of questioning. See Tr. 235.
[3] Finger claimed to have been a member of a SEAL unit for three years while in the Navy, but did not initially remember what the acronym stood for, thinking it stood for "special enlistment." Tr. 823. He only remembered the correct meaning when the answer was volunteered by the state on cross-examination. Tr. 823. After the verdict, Finger admitted to the court that he had lied about having been a Navy SEAL. Tr. 982. According to the U.S. Navy Fact File the SEAL unit is an elite unit "developed to conduct unconventional warfare, counter-guerilla warfare and clandestine operations in both blue and brown water environments," and the acronym stands for "sea, air, land."http://www.chinfo.navy.mil/navpalib/factfile/personnel/seals/se als.html.
[4] Also see State v. Jordan (Apr. 29, 1999), Cuyahoga App. No. 73453, 1999 Ohio App. LEXIS 1956, appeal dismissed (1999), 86 Ohio St.3d 1488,716 N.E.2d 721, and State v. Jacks (1989), 63 Ohio App.3d 200,578 N.E.2d 512.