THE STATE OF OHIO, APPELLEE, *v*. SAPP, APPELLANT.

[Cite as *State v. Sapp*, **105 Ohio St.3d 104, 2004-Ohio-7008.**]

*Criminal law — Aggravated murder — R.C. 2929.04(A)(5) — Course-of-conduct specification requires connection between two or more offenses — Convictions and death penalty upheld.*

(No. 2003-0135 — Submitted September 28, 2004 — Decided December 29, 2004.)

APPEAL from the Court of Appeals for Clark County, No. 99 CA 84, 2002-Ohio-6863.

_____

SYLLABUS OF THE COURT

The statutory phrase "course of conduct" found in R.C. 2929.04(A)(5) requires that the state establish some factual link between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact "must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together." (*State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692, applying course-of-conduct provision in North Carolina death-penalty scheme, approved and followed.)

_____

FRANCIS E. SWEENEY, SR., J.

{¶ 1} On August 22, 1992, appellant, William K. Sapp, raped and murdered Phree Morrow, age 12, and Martha Leach, age 11. A year and 17 days later, Sapp raped and murdered Belinda Anderson, an adult woman. About three

months after he murdered Anderson, Sapp raped and attempted to murder another adult woman, Hazel Pearson. Sapp was sentenced to death for the murders of Phree, Martha, and Anderson.

*The Murders of Phree Morrow and Martha Leach*

**{¶ 2}** Phree Morrow and Martha Leach lived around the corner from each other in Springfield and became friends in the summer of 1992. On the afternoon of August 22, 1992, the girls went to Schuler's Bakery together. At about the same time, two friends of Sapp's, David Marciszewski and David's stepson, John Balser, were seen near the bakery. Martha entered the bakery with an unidentified male. She purchased some cookies and doughnuts. The unidentified man paid for her order, and the two of them left the bakery.

**{¶ 3}** Ralph DePriest, David Marciszewski's nephew, witnessed the murders of Phree and Martha when he was 14. On August 22, 1992, DePriest was at the Marciszewski residence with Wanda Marciszewski, who was David Marciszewski's wife and Balser's mother. Balser entered the house and said, "Mom, I'm in some trouble." DePriest and Wanda went outside and got into a van with David Marciszewski and Christopher Bibbs. They drove to an area near a pond, which lay behind the bakery.

**{¶ 4}** When they arrived, DePriest saw Sapp kneeling beside two girls who were lying unconscious on the ground. DePriest described the girls as being "all messed up." DePriest watched as Sapp, David Marciszewski, Jamie Turner, and Balser rubbed the girls' genitals. Sapp made DePriest participate. After they had done this "for a while," Wanda told them to kill the girls.

**{¶ 5}** Balser and David hit the girls with rocks. DePriest saw Sapp pick up a rock and lift it over his head. DePriest turned away before Sapp brought the rock down.

**{¶ 6}** Sapp threatened to kill DePriest if he ever told anyone what he had seen. Sapp, Balser, David Marciszewski, and Turner then moved the bodies a

2

short distance from the pond to a nearby hill. DePriest helped them cover the bodies with skids.

{¶ 7} The next day, the bodies of Phree and Martha were found in the vicinity of a pond behind Penn Street in Springfield, near Schuler's Bakery. Wooden pallets, branches, and leaves covered the bodies. Phree had a rock on her head.

{¶ 8} In the part of a large storm sewer known locally as the "Lion's Cage," police found a bicycle, a brick, and two pairs of shorts. Phree Morrow's mother identified one pair of shorts as the pair Phree had been wearing when last seen. Another witness identified the bicycle as the one she had seen in the possession of two girls outside Schuler's Bakery on August 22, 1992.

{¶ 9} The shorts were examined by Timothy Shepherd, a police forensic criminalist. According to Shepherd, the shorts had not been torn from Phree's body; rather, someone had "disassembled" them by cutting the seams with a sharp instrument.

{¶ 10} Autopsies revealed that both Phree and Martha had died of blunt head trauma. Phree had been struck in the head at least six times, Martha three. The skulls of both girls had been fractured by blows having an impact equivalent to that of a free fall from a second-story window onto a concrete surface. Both girls also had bruises on their legs and torsos. Sperm was found on swabs taken from each girl's vagina.

{¶ 11} David and Wanda Marciszewski, John Balser, Jamie Turner, and Christopher Bibbs were all convicted of crimes arising from the murders of Phree and Martha. However, Sapp's involvement did not come to light until 1996. In September of that year, sheriff's detectives from Jacksonville, Florida came to Springfield to question Sapp about an unrelated matter. Sapp made incriminating admissions about an assault on Hazel Pearson, whose pants had been cut off in the same distinctive manner as Phree's shorts.

{¶ 12} Sapp then became a suspect in the Morrow-Leach murders. A blood sample obtained from Sapp was sent to the Federal Bureau of Investigation for DNA comparison with the vaginal swabs taken from Phree and Martha. The FBI laboratory determined that the DNA loci obtained from the semen on both swabs matched the DNA loci obtained from a sample of Sapp's blood. An FBI expert concluded that, to a reasonable degree of scientific certainty, Sapp was the source of the semen found in both Phree and Martha.

{¶ 13} On April 2, 1997, Sapp was brought to Springfield police headquarters for questioning. Over the course of two days, Sapp confessed at length to the crimes charged in this case. He gave the following account of the Morrow-Leach murders:

{¶ 14} On August 22, 1992, Sapp was with David Marciszewski, Balser, Turner, and Bibbs. The five of them ended up at a pond located behind a business on Penn Street, not far from Schuler's Bakery. Sapp claimed that the girls were already at the pond when he and his friends arrived. According to Sapp, Phree called Turner "ugly" and Balser a "retard." Then Sapp punched Phree in the head.

{¶ 15} Sapp cut Phree's shorts off her body with a buck knife, an act he later referred to as "leaving [his] name." He next made Phree roll over onto her stomach and forced Martha to lie on top of her. Then Sapp raped Martha.

{¶ 16} After the rape, Sapp and the others took turns hitting Phree in the head with rocks. After each perpetrator had taken a turn, Sapp heard Phree gurgle. Sapp lifted a large rock over his head and – as Sapp described it – "threw it down, trying to send [it] on the other side of the world." He later explained to police that he struck the second blow specifically "[b]ecause she wasn't dead yet." Sapp told police he used a "boulder" to strike the second blow because "[i]f it's gonna be done, it's gonna be done right."

**{¶ 17}** Next, Sapp hit Martha in the head with a rock. After that, he raped Phree. Sapp and the others then moved the girls and covered them with leaves, branches, and discarded pallets. They took the clothing and bicycles belonging to Phree and Martha and placed them in the storm sewer.

**{¶ 18}** After the interrogation, Sapp was held in the Clark County Jail. On April 17, 1997, a deputy sheriff overheard Sapp tell another inmate: "I'm gonna make national news. * * * I've killed several people, but mostly it's about two little girls. * * * But God forgives me for it now because I've been saved."

**{¶ 19}** On June 29, 1998, Sapp stated in the presence of two deputy sheriffs that he had "killed a couple of people" or that he had "killed people before."

**{¶ 20}** During June and July 1998, Sapp had several conversations with another Clark County Jail inmate, Johnny Saxour. According to Saxour, Sapp said that "whenever he got for [sic] the taste of blood, * * * he always went out, took care of his problems."

**{¶ 21}** Sapp told Saxour different versions of the Morrow-Leach murders. In one version, Sapp claimed that he "went with" the mother of one of the girls but became angry because the mother started seeing another man. Sapp told Saxour that "he tried to mess around with the other little girl and she didn't want him messing around, so * * * she smacked him and then this other little girl jumped on his back and then * * * Turner * * * pulled her off of his back and throwed her down on the ground and took his foot and stuck it on the side of her head."

**{¶ 22}** In another conversation, Sapp told Saxour that he had tried to have sex with one of the girls. When he was rebuffed, "he took and started beating this girl * * * and that's when they * * * started taking bricks and things and * * * caving their heads and stuff in * * * ."

*The Murder of Belinda Anderson*

**{¶ 23}** On September 8, 1993, Belinda Anderson of Bellefontaine was staying with her sister Debra in Springfield. At 5:20 p.m. on September 8, Debra left the house to visit her parents. When she returned at 6:00 p.m., she found that Belinda had gone out, leaving a note. Debra never saw her sister again.

**{¶ 24}** Nearly two years later, on July 8, 1995, Belinda Anderson's body was found buried under the dirt floor of a garage in Springfield. At the time of Anderson's disappearance in 1993, the house and garage had been vacant for several years. Anderson's body had been placed in a plastic bag and buried in a shallow grave with the feet sticking out. She was wearing a shirt, shoes, and socks, but no pants.

**{¶ 25}** An autopsy showed that Anderson had died of multiple trauma to her head and neck. She had three chop wounds and a bruise on her face, and some of her facial bones were fractured. A blow to the back of Anderson's head had lacerated her scalp and abraded the outer layer of the skull underneath. Her larynx was broken. Each of these injuries had been inflicted before death. Because of the body's decomposition, it was not possible to test for the presence of sperm or semen.

**{¶ 26}** In his confession to the Springfield police, Sapp said that he had met Belinda Anderson for the first time on the day he killed her. According to Sapp, Anderson agreed to have sex with him for $40 and led him to a garage, which they entered through a hole in the back. Sapp claimed that he had paid Anderson in advance and that she began to perform fellatio on him. But then she stopped, saying that she had changed her mind and "wasn't doing the rest." When Sapp demanded a refund, Anderson started to leave. He reached down to grab her, and she hit him.

**{¶ 27}** Sapp grabbed Anderson by the throat. She resisted. He threw her against a wall. He picked up a length of pipe and hit Anderson in the head. She "dropped." Then she started to get up, threatening to call the police.

{¶ 28} Sapp felt "like [he] was on fire inside." He picked up a piece of metal and hit Anderson several times because "she wouldn't shut up." Sapp described to police how Anderson "gurgle[d]." He remarked, "[H]ow many times you gotta hit a person before they stop * * * trying to get up[?]"

{¶ 29} Sapp claimed he never had sex with Anderson, except for the allegedly consensual fellatio. But he also told police that he had been determined to "get what [he] paid for" or get a refund. In any event, he cut Anderson's pants off with a hunting knife, reasoning, "I done bought 'em, so I took 'em off for her." He "didn't even ask her."

{¶ 30} After beating Anderson and cutting her pants off, Sapp fled. A few days later, he returned. He put a plastic bag over Anderson's head and another over her feet. Then he buried her in the garage.

{¶ 31} Sapp later told Johnny Saxour about this crime. He told Saxour that "he just got a taste for blood and he * * * ran into this woman and * * * started beating on her * * * and took her in the garage to do what he had to do with her and then he stuck her underneath the floor." Sapp told Saxour that he raped her and that he "used a jar of Vaseline on her."

*The Attempted Murder of Hazel Pearson*

{¶ 32} On December 7, 1993, Hazel Pearson and her boyfriend, "Butch" Morgan, encountered a former girlfriend of Morgan's in a Springfield bar. Pearson became upset and left.

{¶ 33} The next morning, employees at a packaging company in Springfield saw Pearson sitting in a nearby parking lot. When they realized that she was hurt, they went to her aid. She was nude from the waist down. One of the employees asked her if she had been raped, and she nodded. Paramedics were summoned to take Pearson to the hospital. As they lifted her into the ambulance, numerous cuts on her body opened, and she screamed in pain.

**{¶ 34}** Pearson's throat had been cut from ear to ear, and she had a deep stab wound in her upper abdomen. She had an open wound at the base of her nose, multiple cheekbone and jaw fractures, and a fracture of the orbital floor, the bone at the base of the eye. Underneath her lacerated scalp, she had a fractured skull and serious brain injuries. Her face was swollen and badly bruised. Her whole body was black and blue, and stones were embedded in her flesh.

**{¶ 35}** When Pearson woke up in the hospital, she noticed that her watch was missing. She recalled crawling toward some railroad tracks but could remember nothing else that had happened after she left the bar.

**{¶ 36}** Police found a pair of jeans in the parking lot near the spot where Pearson had been found. Springfield police criminalist Timothy Shepherd examined the jeans and concluded that they had been "disassembled" in the same manner as Phree Morrow's shorts. Police also found bloodstains underneath a nearby loading dock. In 1994, the custodian of a church in Springfield found a knife stuck into the church roof.

**{¶ 37}** On September 26, 1996, at the Clark County Jail, Sapp mentioned the Hazel Pearson case to detectives from Jacksonville, Florida. Claiming that he had acted through another personality, Sapp mentioned that he had cut Pearson's throat, that he had taken her watch, and that he had thrown the knife onto the church roof.

**{¶ 38}** In his subsequent confession to the Springfield police, Sapp admitted that he had raped Pearson and had tried to kill her. Sapp told detectives that, on the day he met Pearson, he was "pretty f * * * ed up" from drink and pills. He saw Pearson crying on a street corner and approached her. Pearson complained to Sapp that her boyfriend was in a bar with another woman; Pearson had walked out of the bar after "some words and a little push contest."

**{¶ 39}** Sapp and Pearson walked together until they reached some railroad tracks. There, according to Sapp, they "kissed and messed around a little bit."

But Pearson said, "[W]hy is it that all men * * * got to have that stubble shit. Just like Butch." Then, according to Sapp, she slapped him.

{¶ 40} Sapp became furious. He was thinking that "[the] bitch needed to die. All bitches needed to die. It was time for that kind of shit to stop. It ain't gonna happen no more." Sapp assaulted Pearson. He beat her with a piece of steel cable, kicked her repeatedly, and stabbed her in the stomach.

{¶ 41} At some point, Sapp removed Pearson's pants and had intercourse with her without ejaculating. Sapp indicated to police that the sex was consensual. Consistent with that claim, Sapp initially told police that he had pulled Pearson's jeans off. However, he then claimed to have torn them off and finally admitted that he spent seven to 12 minutes cutting Pearson's jeans off.

{¶ 42} Once Pearson stopped moving, Sapp hid her under a nearby loading dock and ran away. As he fled, he threw his knife onto the church roof and hid the piece of cable in a storm drain. Police later recovered the piece of steel cable identified by Sapp from the storm drain.

{¶ 43} While confessing to this crime, Sapp mentioned that he owned a surgical scalpel that had belonged to his mother; it was the "[s]ame one she cut [his] pants off with."

{¶ 44} Sapp later told Johnny Saxour that he "jumped on" a woman at a location near Selma Road "because she had a pink outfit on and he didn't like her outfit and he started beating her with a crow bar * * * . And he thought he had killed her, but somebody had hollered at him and he took a-running and he thought the girl was dead when he left her."

*Indictment, Trial, and Sentence*

{¶ 45} The grand jury returned a 27-count indictment against Sapp. The indictment included three counts of aggravated murder with prior calculation and design pursuant to R.C. 2903.01(A), three counts of aggravated murder during a

rape pursuant to R.C. 2903.01(B), and three counts of aggravated murder during a kidnapping pursuant to R.C. 2903.01(B).

{¶ 46} Each aggravated murder count carried the following death specifications: (1) the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons pursuant to R.C. 2929.04(A)(5), and (2) the defendant committed the aggravated murder while committing rape or kidnapping, R.C. 2929.04(A)(7). Counts 1 through 6, as originally charged, also carried specifications under R.C. 2929.04(A)(3) (offense was committed to avoid apprehension), but these specifications were dismissed on the state's motion before trial.

{¶ 47} Two counts charged Sapp with the attempted aggravated murder of Hazel Pearson. Sapp was also charged with four counts of rape, four counts of kidnapping, three counts of evidence tampering, pursuant to R.C. 2921.12(A)(1), and three counts of abusing a corpse pursuant to R.C. 2927.01(B). Two arson counts were severed before trial.

{¶ 48} Sapp was convicted of all counts and specifications, and a mitigation hearing was held to sentence him on the Morrow, Leach, and Anderson aggravated murders. Before submitting the case to the jury in the penalty phase, the trial judge merged the aggravated murder counts into a single count for each victim.

{¶ 49} The jury recommended death on each aggravated murder count. The trial judge sentenced Sapp to death on each count. The court of appeals affirmed Sapp's convictions and death sentences. The cause is now before us on an appeal as of right, pursuant to R.C. 2929.05(A) and Section 2(B)(2)(c), Article IV, Ohio Constitution.

{¶ 50} In this appeal, Sapp raises 16 propositions of law. After full consideration, we conclude that Sapp's claims do not require reversal of his convictions or sentences. We have also independently reviewed Sapp's death

sentences, as R.C. 2929.05(A) requires, for appropriateness and proportionality. For the reasons that follow, we affirm Sapp's convictions and death sentences.

I. Course-of-Conduct Specification

{¶ 51} In his fifth proposition of law, Sapp contends that the evidence does not support his conviction of the course-of-conduct death specification on Counts 14, 15, and 16, the counts charging the aggravated murder of Anderson. Sapp contends that the three murders and one attempted murder in this case do not constitute a single "course of conduct involving the purposeful killing of or attempt to kill two or more persons" within the meaning of R.C. 2929.04(A)(5). While conceding that the Morrow and Leach murders, which happened at the same time and place and were similar in manner, constitute such a "course of conduct," Sapp contends that the murder of Anderson and the attempted murder of Pearson are not part of that same course of conduct.

{¶ 52} This proposition of law raises the question: When may a purposeful killing or attempt to kill be considered "part of a course of conduct" for purposes of R.C. 2929.04(A)(5)? We believe that the statutory phrase "course of conduct" found in R.C. 2929.04(A)(5) requires that the state establish some factual link between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact "must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together." *State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692 (applying course-of-conduct provision in North Carolina death-penalty scheme). See, also, *State v. Price* (1990), 326 N.C. 56, 81, 388 S.E.2d 84. Thus, for instance, the factual link might be one of time, location, murder weapon, or cause of death. It might involve the killing of victims who are close in age or who are related. It might involve a similar motivation on the killer's part for his crimes, a

common getaway car, or perhaps a similar pattern of secondary crimes (such as rape) involving each victim. Whatever the link or links between the multiple murders might be, the statutory words "course of conduct" compel the government to present evidence of those connections.

{¶ 53} In arguing that the Morrow-Leach murders and the Anderson and Pearson crimes do not constitute a single course of conduct, Sapp stresses the length of time separating the offenses. Anderson was murdered over a year after the Morrow-Leach murders, and the attempted murder of Pearson took place three months after that.

{¶ 54} We agree with Sapp that when two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), the amount of time between the offenses is a relevant factor. See *Price*, 326 N.C. at 81, 388 S.E.2d 84 ("temporal proximity" can be a factor in determining whether offenses are part of the same course of conduct).

{¶ 55} Nevertheless, we have said that murders taking place at different times "may satisfy the R.C. 2929.04(A)(5) specification so long as the offender's actions were part of a continuing course of criminal conduct." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 71. Thus, the length of time between offenses does not necessarily determine whether the offenses form a course of conduct.

{¶ 56} Instead, when two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), all the circumstances of the offenses must be taken into account. "The further apart the acts are temporally, the more incumbent it is upon a court to carefully consider other factors * * * in determining whether the acts * * * are part of a course of conduct." *Cummings*, 332 N.C. at 510, 422 S.E.2d 692.

{¶ 57} Thus, in *Cummings*, the jury could find that two murders 26 months apart were part of the same course of conduct because they had a common

modus operandi and "similar, if not identical, motivations," and the victims were sisters.  Id., 332 N.C. at 511, 422 S.E.2d 692.  And in *Corwin v. State* (Tex.Crim.App.1993), 870 S.W.2d 23, 28, the court held that a defendant's actions in abducting, raping, and killing or attempting to kill five women "in more or less the same way" over 13 years could reasonably be found to constitute a course of conduct.

{¶ 58} Sapp points out that the factual circumstances and modi operandi of the offenses in this case varied in several ways.  Phree and Martha were children, but Anderson and Pearson were adults.  Sapp murdered Phree and Martha in concert with several other perpetrators, but he was the sole perpetrator when he murdered Anderson and attempted to murder Pearson.  Phree and Martha were beaten to death with rocks, but Anderson was stabbed and beaten with a pipe, while Pearson was stabbed, slashed, and beaten with a piece of cable.  The crimes against Phree, Martha, and Pearson took place outdoors, but Anderson was killed in a garage.  The bodies of Phree and Martha were moved a short distance and were covered with debris; Anderson was partly buried under the dirt floor of the garage; Pearson was pushed underneath a loading dock.

{¶ 59} Despite these differences, the offenses in this case were also similar in significant ways.  Sapp removed the pants from Phree, Anderson, and Pearson in the same distinctive fashion, by using his knife to cut the seams open – a method Sapp himself referred to as "leaving [his] name."  Each victim was raped and left nude from the waist down.  Each victim was battered in the head with an object picked up at the scene of the crime, and each suffered a fractured skull.

{¶ 60} There was also evidence of a common motive.  Sapp told Johnny Saxour that "whenever he got * * * the taste of blood, * * * he always went out [and] took care of his problems."  He also compared cutting off the victims' pants to "opening up a Christmas present * * * fold by fold."  The evidence thus

indicates that Sapp committed each of these murders for pleasure, to gratify his recurring "taste for blood." Moreover, in each case, Sapp perceived one of the victims as having provoked him somehow. Phree allegedly insulted John Balser; Anderson and Pearson allegedly struck Sapp; Pearson allegedly disparaged Sapp's grooming.

{¶ 61} Under the totality of the circumstances, we find that the evidence in this case was legally sufficient to prove that the murder of Anderson and the attempted murder of Pearson were part of a single "course of conduct involving more than one intentional killing or attempted killing." Accordingly, Sapp's fifth proposition of law is overruled.

II. Joinder and Motion to Sever

{¶ 62} Before trial, Sapp filed a "motion to sever counts." Sapp argued that the 27 counts in the indictment should be severed into four groups, each to be tried in a separate proceeding, as follows:

{¶ 63} (1) Counts 1-13, charging Sapp with the aggravated murders of Phree Morrow and Martha Leach and with related crimes (rape, kidnapping, evidence tampering);

{¶ 64} (2) Counts 14-20, charging Sapp with the aggravated murder of Belinda Anderson and related crimes;

{¶ 65} (3) Counts 21-25, charging Sapp with the attempted aggravated murder of Hazel Pearson and related crimes;

{¶ 66} (4) Counts 26 and 27, charging Sapp with arson.

{¶ 67} The trial court severed the arson counts but otherwise denied the motion, and counts one through 25 were tried in a single proceeding. In his third proposition of law, Sapp asserts that the trial court prejudiced him by denying the requested severance.

{¶ 68} Although Sapp filed a pretrial motion for severance, he did not renew it at the close of the state's case or at the conclusion of all the evidence.

The court of appeals held that Sapp's objection to joinder was thereby waived. See, e.g., *State v. Miller* (1995), 105 Ohio App.3d 679, 691, 664 N.E.2d 1309; *State v. Walker* (1990), 66 Ohio App.3d 518, 522, 585 N.E.2d 848; *State v. Strobel* (1988), 51 Ohio App.3d 31, 33, 554 N.E.2d 916; *State v. Brady* (1988), 48 Ohio App.3d 41, 44, 548 N.E.2d 278; *State v. Owens* (1975), 51 Ohio App.2d 132, 5 O.O.3d 290, 146, 366 N.E.2d 1367. But, see, *State v. Miller*, Stark App. No. 2003CA00273, 2004-Ohio-3716, 2004 WL 1564157, ¶ 15, fn.1. However, the state has elected not to argue waiver. Hence, we will decide the joinder issue on its merits.

## A. Merits

{¶ 69} "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293, quoting *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288, fn. 2. A defendant requesting severance "has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *Torres*, 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288. A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. Id.

{¶ 70} "Where the evidence of each of the joined offenses would be admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of a criminal disposition is largely absent." *State v. Hamblin* (1988), 37 Ohio St.3d 153, 159, 524 N.E.2d 476.

{¶ 71} In this case, if Sapp's motion had been granted and the charges relating to each incident had been tried separately, nevertheless, "the evidence of all the offenses would have been admissible in each trial." *State v. Benner* (1988), 40 Ohio St.3d 301, 306, 533 N.E.2d 701. Because "each [murder] or

attempted [murder] was relevant to the course-of-conduct specification," evidence relating to each of the murders and attempted murders would have been admissible at separate trials of the Morrow-Leach murders and the Anderson murder.  Id.

{¶ 72} Moreover, evidence of each murder would also have been admissible at separate trials under Evid.R. 404(B) in order to prove the identity of the perpetrator.  See, generally, *State v. Jamison* (1990), 49 Ohio St.3d 182, 184-187, 552 N.E.2d 180.  During each incident, Sapp cut the pants off his victims in a distinctive fashion.  Furthermore, he "consistently directed violence to a victim's head."   Id., 49 Ohio St.3d at 186, 552 N.E.2d 180.  Although the crimes differed from one another in some respects, "[a]dmissibility is not adversely affected simply because the other [crimes] differed in some details."  Id., 49 Ohio St.3d at 187, 552 N.E.2d 180.

{¶ 73} Finally, claims of prejudice are less persuasive where the evidence is "amply sufficient to sustain each verdict, whether or not the indictments were tried together."  *Torres*, 66 Ohio St.2d at 344, 20 O.O.3d 313, 421 N.E.2d 1288; cf. *State v. Schaim* (1992), 65 Ohio St.3d 51, 62, 600 N.E.2d 661.  In this case, Sapp's confessions and statements, along with the corroborating evidence, provided strong evidence of guilt.  The strength of the state's proof "establishes that the prosecution did not attempt to prove one case simply by questionable evidence of other offenses."  *Jamison*, 49 Ohio St.3d at 187, 552 N.E.2d 180.

{¶ 74} For the foregoing reasons, we conclude that the trial judge did not abuse his discretion in denying severance, and joinder was not prejudicial to Sapp. We therefore overrule Sapp's third proposition of law.

B. Ineffective Assistance of Counsel

{¶ 75} In his fourth proposition of law, Sapp contends that his trial counsel were ineffective because they did not renew his motion for severance at the close of the evidence.

16

**{¶ 76}** Ineffective-assistance claims are governed by a two-part test. The defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) resulting prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. See *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Williams v. Taylor* (2000), 529 U.S. 362, 390-391, 120 S.Ct. 1495, 146 L.Ed.2d 389; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

**{¶ 77}** Sapp fails to show from the record that counsel's nonrenewal of the motion was the result of any deficiency in their performance. Sapp also fails to show how he was prejudiced. As we note in our discussion of Sapp's third proposition, the trial court did not abuse its discretion in denying severance.

**{¶ 78}** Moreover, no reasonable probability exists that the trial would have turned out differently had a severance been granted, inasmuch as Sapp confessed to all the crimes he was charged with. Finally, because we have reviewed the severance issue on its merits, counsel's failure to renew the motion has not caused Sapp to forfeit merit review of that issue. We overrule Sapp's fourth proposition of law.

### III. Motion to Suppress Statements

**{¶ 79}** In his first proposition of law, Sapp contends that his Fifth Amendment waiver and his ensuing confessions to police were involuntary and that the trial court should therefore have suppressed them.

### A. Fifth Amendment Claim

**{¶ 80}** On September 26, 1996, sheriff's detectives from Jacksonville, Florida interrogated Sapp at the Clark County Jail, where he awaited assignment to the state correctional system after being convicted in an unrelated case. The detectives intended to question Sapp about a homicide in Jacksonville. They

advised Sapp of his *Miranda* rights and asked whether he understood them. Sapp signed a written waiver. It appeared to the detectives that he understood his rights. Sapp stated that he was not under the influence of alcohol or illegal drugs. (He did, however, inform the officers that he was taking Prozac.) During the interview, Sapp made admissions about the Hazel Pearson assault. The Jacksonville officers summoned a Springfield detective, who then questioned Sapp further about Pearson.

**{¶ 81}** On April 2 and 3, 1997, Springfield detectives interrogated Sapp after bringing him back to Springfield from the state correctional system. Before questioning Sapp, the detectives advised him of his rights. On both occasions, he acknowledged his understanding and signed written waivers. During 15 hours of interviews, Sapp confessed to killing Phree Morrow, Martha Leach, and Belinda Anderson and assaulting Hazel Pearson.

**{¶ 82}** "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances * * *." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. However, " 'police overreaching' is a prerequisite to a finding of involuntariness. Evidence of use by the interrogators of an inherently coercive tactic (*e.g.*, physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis." *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, quoting *Colorado v. Connelly* (1986), 479 U.S. 157, 163, 107 S.Ct. 515, 93 L.Ed.2d 473; see, also, *State v. Dailey* (1990), 53 Ohio St.3d 88, 91, 559 N.E.2d 459. Thus, at the threshold, Sapp must show that the detectives used an inherently coercive tactic on him.

**{¶ 83}** Sapp contended at trial that the detectives played on his psychological vulnerability by promising to obtain help for his psychological problems. For instance, one of the Florida detectives told him, "You want to get

some help for Bob [a reference to Sapp's supposed alter ego], we'll get you help for Bob." At various times, detectives suggested that Sapp "need[ed] to talk" because it would help him in "dealing with" his problems. By telling the truth, they said, Sapp would "get the demon out," "get rid of Bob," and "take control [of himself] back." He would thereby "get some peace," "stop * * * the pain" and be able to "live a normal life."

**{¶ 84}** Promises of help with "collateral problems," such as psychological problems, are not inherently coercive. See *Miller v. Fenton* (C.A.3, 1986), 796 F.2d 598, 610; see, also, *Hall v. State* (1986), 180 Ga.App. 366, 367, 349 S.E.2d 255. The detectives never offered to obtain psychiatric help for Sapp *in exchange for information*. See *State v. Beck* (Fla.App.1980), 390 So.2d 748, 749. Nor did they suggest that Sapp could expect to receive psychiatric help "instead of prosecution and punishment." *State v. Thaggard* (Minn.1995), 527 N.W.2d 804, 812. The detectives simply "suggest[ed] that telling the truth would relieve defendant of a psychological burden." *People v. Jones* (1998), 17 Cal.4th 279, 298, 70 Cal.Rptr.2d 793, 949 P.2d 890. That suggestion is not coercive.

**{¶ 85}** Nor was the length of the interrogations coercive. The September 26 interrogation by the Florida officers lasted about three hours and 25 minutes with a four-minute break about halfway through.

**{¶ 86}** On April 2, Sapp was given a drink and permitted to use the bathroom before the interrogation began. This interview began at 2:30 p.m. and lasted until 11:45 p.m., with five breaks. The April 3 interview began at 9:35 a.m. and lasted until 6:00 p.m., with three breaks. Not counting breaks, the two interviews took slightly more than 15 hours during a 27½-hour period.

**{¶ 87}** While the interviews of April 2 and 3 were lengthy – necessarily so, considering the number of crimes to which Sapp was confessing – Sapp was never interrogated for more than four hours without a break. He was fed and given drinks during both interviews. He was permitted to use the bathroom and

take his medications. On April 2, Sapp slept overnight on a mattress in the interview room; he said he preferred that to sleeping in a cell. The interrogations were predominantly cordial in tone. Thus, we find that the police did not employ inherently coercive tactics on Sapp.

{¶ 88} Moreover, Sapp's waivers and confessions were voluntary under the totality of the circumstances. The totality of the circumstances includes "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *Edwards*, 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus.

{¶ 89} As we have already noted, the circumstances of these interrogations were not coercive. Furthermore, Sapp signed written waivers on September 26 and April 2 before being questioned. "An accused's signed waiver form is strong proof that the waiver was valid." *State v. Moore* (1998), 81 Ohio St.3d 22, 32, 689 N.E.2d 1; see *N. Carolina v. Butler* (1979), 441 U.S. 369, 374-375, 99 S.Ct. 1755, 60 L.Ed.2d 286. Sapp indicated that he understood his rights. During the September 26 interrogation, he read his rights aloud from the waiver form. He never expressed any desire to remain silent or to consult counsel.

{¶ 90} When Sapp executed these waivers, he was familiar with his rights and with the criminal justice system in general. Sapp had been interrogated in connection with other crimes — and had been read his *Miranda* rights — on two other occasions during 1996. The September 26, 1996 interview was thus Sapp's second recent encounter with police questioning, and the April 2-3, 1997 interview was his fourth.

{¶ 91} Dr. John Gibfreid visited Sapp during the April 2 interview and provided him with Prozac and lithium. At the suppression hearing, Gibfried testified that Prozac is an antidepressant and lithium is a treatment for mood

swings. Neither drug is a sedative or tranquilizer, and Gibfried testified that neither drug would affect a person's ability to comprehend *Miranda* warnings.

{¶ 92} The record permitted the trial court to conclude that Sapp's *Miranda* waivers and his statements on September 26, 1996, and April 2 and 3, 1997, were voluntary. Sapp's Fifth Amendment claim therefore lacks merit.

## B. Sixth Amendment Claim

{¶ 93} Sapp also raises a Sixth Amendment issue. He contends that police questioned him even though they knew that he had recently been represented by counsel in another, unrelated case. However, "an accused's Sixth Amendment right is offense specific. Thus, * * * appointment of counsel with respect to one offense does not bar police questioning as to a second uncharged offense." *State v. Hill* (1995), 73 Ohio St.3d 433, 446, 653 N.E.2d 271, citing *McNeil v. Wisconsin* (1991), 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158. See, also, *Texas v. Cobb* (2001), 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321. At the time of the interrogations, there had been no "adversary judicial criminal proceedings," *McNeil*, 501 U.S. at 175, 111 S.Ct. 2204, 115 L.Ed.2d 158, *in the instant case*. Hence, Sapp's Sixth Amendment right to counsel in the instant case had not yet attached.

{¶ 94} Sapp's first proposition of law is overruled.

## C. Ineffective Assistance of Counsel

{¶ 95} In his second proposition of law, Sapp contends that counsel rendered ineffective assistance because they failed to ask the trial court to state, pursuant to the wording of Crim.R. 12(F), its findings of fact on the motion to suppress statements.

{¶ 96} As previously noted, Sapp must show both deficient performance by counsel and prejudice – in other words, a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. He contends that the trial court's failure to make findings of fact is prejudicial because this

court cannot properly review the denial of his motion to suppress without having the trial court's factual findings before it. We disagree. The extensive record of the suppression hearing is "sufficient to allow full review of the suppression issue." *State v. Waddy* (1992), 63 Ohio St.3d 424, 443, 588 N.E.2d 819; see, also, *State v. Brewer* (1990), 48 Ohio St.3d 50, 60, 549 N.E.2d 491. Hence, Sapp cannot show a reasonable probability that the result would have been different if his counsel had requested findings under the wording of Crim.R. 12(F). We overrule Sapp's second proposition.

## IV. Instructions

{¶ 97} In his ninth proposition, Sapp contends that the trial court improperly instructed the jury in the guilt phase. Sapp admits that he did not object to the challenged instructions at trial. Therefore, the claims asserted in this proposition are waived. In order to overcome the waiver, Sapp must show plain error. An alleged error is plain error only if the error is "obvious," *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

{¶ 98} The trial court instructed that Sapp was "responsible for the natural and foreseeable results that follow in the ordinary course of the events from the act." Sapp contends that this instruction was improper because it permitted a conviction without a finding of specific intent to kill. However, we have held that it is not plain error to give the standard foreseeability instruction in a murder case where the instructions as a whole make clear that the jury must find purpose to kill in order to convict. See, e.g., *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 105. Here, "[t]he trial court extensively instructed the jury on the requirement of purpose and intent prior to the causation language." *State v. Goodwin* (1999), 84 Ohio St.3d 331, 346, 703 N.E.2d 1251. Thus, the causation instruction was not plain error, and the issue is waived. *Williams*.

**{¶ 99}** Sapp also contends that the trial court incorrectly instructed the jury on reasonable doubt. But we have repeatedly rejected similar claims. See, e.g., *State v. Stallings* (2000), 89 Ohio St.3d 280, 293-294, 731 N.E.2d 159; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 493, 653 N.E.2d 304. Thus, Sapp cannot show plain error, and this issue is waived as well. Because both issues raised in Sapp's ninth proposition were waived at trial, that proposition is overruled.

V. Ineffective Assistance of Counsel

**{¶ 100}** In his 12th proposition, Sapp contends that counsel's failure to preserve claims of error constituted ineffective assistance of counsel. However, Sapp does not identify any specific claim whose waiver was prejudicial to him. We overrule Sapp's 12th proposition.

VI. Settled Issues

**{¶ 101}** Sapp's tenth, 11th, 14th and 15th propositions of law raise well-settled issues and are summarily overruled. See, generally, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800. We overrule Sapp's tenth proposition on authority of *State v. Bey* (1999), 85 Ohio St.3d 487, 499-500, 709 N.E.2d 484; see, also, *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 36 (summarily rejecting claim). We overrule his 11th proposition on authority of *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. We overrule his 14th and 15th propositions on authority of *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; and *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237.

**{¶ 102}** In his 16th proposition of law, Sapp contends that appellate reweighing of aggravating circumstances and mitigating factors is

unconstitutional under *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. However, as Sapp acknowledges, the *Ring* court specifically declined to address appellate reweighing. *Ring*, 536 U.S. at 597, 122 S.Ct. 2428, 153 L.Ed.2d 556, fn. 4. We therefore adhere to our precedents, and those of the United States Supreme Court, which permit appellate reweighing. See *Clemons v. Mississippi* (1990), 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725; *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293. Sapp's 16th proposition is overruled.

## VII. Cumulative Error

{¶ 103} In his 13th proposition, Sapp contends that even if we find individual errors harmless, we should find their combined effect prejudicial. As Sapp offers no further analysis, this proposition lacks substance and is overruled.

## VIII. Independent Review

{¶ 104} In his sixth and seventh propositions of law, Sapp claims that the jury and trial judge erred by finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. In his eighth proposition, he asks us to find that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt, and he also argues that the death sentences are inappropriate and disproportionate.

{¶ 105} Each of these propositions invokes our duty under R.C. 2929.05 to engage in an independent review of Sapp's death sentences. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentences are proportionate to those affirmed in similar cases. R.C. 2929.05(A)

{¶ 106} **Aggravating circumstances:** Sapp was convicted of two aggravating circumstances as to each murder: course of conduct, R.C. 2929.04(A)(5), and felony-murder, R.C. 2929.04(A)(7).

{¶ 107} The evidence supporting the (A)(5) specifications is sufficient to show that the murders and attempted murder in this case constituted a "course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." R.C. 2929.04(A)(5). The evidence of the (A)(7) specification is also sufficient as to each aggravated murder. Sapp admitted raping each victim. His semen was found in the vaginas of Phree Morrow and Martha Leach, and he told Johnny Saxour that he raped Belinda Anderson.

{¶ 108} **Mitigating factors:** At trial, Sapp presented evidence of his traumatic childhood, his mental disorders, and his good qualities as a person.

{¶ 109} **Sapp's childhood:** William Kessler Sapp, a.k.a. William Kessler Lilly, was born in 1963, the son of Kessler B. Lilly Sr. and Margaret Lilly. He had four siblings, including Kessler B. Lilly Jr., also known as "J.R."

{¶ 110} Kessler B. Lilly Sr. testified that his mother (Sapp's grandmother) and two of her sisters were mentally ill and committed suicide. Kessler Sr. also testified that Sapp's mother, Margaret Lilly, was admitted to a mental hospital during their marriage, a fact that Margaret, testifying for the state as a rebuttal witness, confirmed. Kessler Sr. testified that Margaret practiced "black witchcraft" and believed she could cast spells and contact dead people. Margaret denied practicing witchcraft but admitted studying it and casting "[a] few love spells." She also claimed to have extrasensory perception.

{¶ 111} J.R. testified that Margaret Lilly neglected him and Sapp. She habitually slept until midafternoon and did not feed, bathe, or supervise them while their father was at work. Both Kessler Sr. and Margaret agreed that Margaret neglected her children.

{¶ 112} During his interrogation of April 3, 1997, Sapp told police that his mother had scarred him with cigarettes, needles, and knives, dripped hot candle wax on his testicles, and performed sex acts on him. A private investigator for the defense testified that Sapp had numerous scars on his body, including three

on his testicles that, in the investigator's opinion, resembled scars caused by burns.

{¶ 113} J.R. testified that Margaret used to burn him and Sapp with cigarettes and that she "forced [Sapp] to have sex with her." But J.R. had told Springfield police before trial that Margaret never sexually abused him or Sapp. According to Kessler Sr., Margaret once burned Sapp's hand on a stove. Another time, Kessler Sr. caught her hitting Sapp with a frying pan. Margaret essentially admitted burning Sapp's hand but denied the other allegations.

{¶ 114} Kessler Sr. divorced Margaret in 1971 and sent Sapp and J.R. to a children's home. They later moved back in with Kessler Sr. Kessler Sr. remarried, but Kessler Sr. testified that his second wife also abused the boys and had sexual intercourse with Sapp.

{¶ 115} **Sapp's marriage:** Karen Sapp is Sapp's former wife. She was involved with him for eight years, and they had three children. Karen also had a son from another relationship. She testified that Sapp had nightmares about his childhood. Karen also testified that Sapp had a good side. He worked every day, helped her with cooking, cleaning, and child care, and accompanied her to the doctor's office during her pregnancies. Sapp treated Karen's son "[p]retty much like his own."

{¶ 116} Karen also testified that Sapp had a quick and violent temper, especially when he drank. Sapp physically abused Karen approximately six times during their years together, principally by choking her and throwing things at her. Each time, however, Karen persuaded him to stop. However, when Springfield police asked Karen before trial whether Sapp had ever abused her, she concealed the choking incidents and said only that he had slapped her once. At trial, Karen claimed that she did not consider choking to be abusive compared to what she had suffered in her childhood.

{¶ 117} **Sapp's mental condition:** Dr. Kathleen Burch, a clinical psychologist, interviewed Sapp for a total of 25 hours. She administered personality and neuropsychological tests. The materials she reviewed included medical and psychological histories of Sapp and his family; police reports; Sapp's jail, school, and children's services records; his correspondence with relatives; his videotaped confessions; and videotapes of Sapp's parents. She also interviewed Karen Sapp.

{¶ 118} Dr. Burch concluded that Sapp has "very severe mental health problems." She diagnosed "chronic and severe" bipolar affective disorder – i.e., a "manic depressive illness." Burch found "strong evidence" of a neurological dysfunction that adversely affected Sapp's impulse control, judgment, and ability to "process complicated information."

{¶ 119} Burch explained that bipolar affective disorder is caused by a chemical imbalance in the brain. "[T]here is considerable evidence that early childhood experience can cause a change in the chemical balance * * * in the brain that's associated with this kind of disorder." The condition can also be inherited.

{¶ 120} A person in a "manic" or "hypomanic" state "usually will do things that show a lack of judgment." These may include "indiscriminate sexual behavior," a tendency to be "irritable and argumentative and get into fights," and other "impulsive" behavior. Then they "crash and go into a depression and often they can't really think very well."

{¶ 121} Sapp also had a "severe personality disorder." Burch attributed this to his temperament, experiences, and reactions to his experiences, which together "have shaped him into a person who has tremendous difficulty getting along in the world and dealing with other people."

{¶ 122} Burch diagnosed an "antisocial personality disorder," a pattern of attitudes and behavior involving "disregard for the rules of society." Such a

disorder is "very often" associated with childhood abuse or neglect. She also diagnosed a "borderline personality disorder." This disorder is characterized by lack of "a secure and stable sense of self identity." People with borderline personality disorder tend to be oversensitive, quick to anger, and impulsive. Such persons suffer from mood swings and sometimes have "psychotic breaks" during which they become paranoid and delusional.

{¶ 123} **Weighing:** Sapp clearly suffered severe abuse and neglect in childhood (Margaret's denials are not credible). This evidence is entitled to some weight, although it is not a strong mitigating factor by itself. See, generally, *State v. Murphy* (2001), 91 Ohio St.3d 516, 547, 747 N.E.2d 765 ("we have seldom accorded strong weight to a defendant's childhood"). Sapp's good qualities, enumerated by his former wife, Karen, are also entitled to some weight, despite the impeachment of Karen's testimony on cross-examination.

{¶ 124} Dr. Burch diagnosed Sapp as having a bipolar disorder and a borderline personality disorder and testified that both conditions make him unusually impulsive and quick to anger. But these murders were not impulsive acts on Sapp's part. The jury found that they were committed with prior calculation and design. Sapp told Saxour that when he got a taste for blood, he "went out [and] took care of his problems." Sapp carried a knife during each murder and used it to remove the pants from his victims, savoring this act as if unwrapping a long-anticipated Christmas present. In light of these facts, Sapp's disorders are entitled to little weight in mitigation. See *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 165-166.

{¶ 125} Weighing these mitigating factors against the aggravating circumstances applicable to the murder of Martha Leach, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. In particular, we believe, the R.C. 2929.04(A)(5) circumstance deserves great weight.

{¶ 126} The same aggravating circumstances apply to the murder of Phree Morrow. One mitigating factor applies to Phree's murder that did not apply to Martha's: Phree's alleged insult of John Balser. However, a verbal insult from a 12-year-old child deserves no weight in mitigation. We conclude that the aggravating circumstances applicable to the murder of Phree Morrow outweigh the mitigating factors beyond a reasonable doubt.

{¶ 127} Finally, we conclude that the aggravating circumstances applicable to the murder of Belinda Anderson outweigh the mitigating factors beyond a reasonable doubt.

{¶ 128} **Proportionality:** The death sentence in this case is proportionate to sentences we have approved in cases carrying death specifications under R.C.2929.04(A)(5) and (A)(7). See *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 613 N.E.2d 212; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 650 N.E.2d 878.

{¶ 129} Sapp's convictions and sentences of death are affirmed.

Judgment affirmed.

MOYER, C.J., RESNICK, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

PFEIFER, J., concurs in part and dissents in part.

—————————————

PFEIFER, J., concurring in part and dissenting in part.

{¶ 130} I concur in the sentence of death with respect to the murders of Phree Morrow and Martha Leach. I dissent from the conclusion that the murder of Belinda Anderson was part of the same course of conduct. The murder of Anderson occurred over a year after and was not related in any way to the murders of Morrow and Leach. See *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-

10, 800 N.E.2d 1133, ¶ 113 (Pfeifer, J., dissenting). In this case, as in *Scott*, "there was ample evidence to support [an]other death-penalty specification[], rendering the course-of-conduct specification unnecessary." Id. at ¶ 116. I concur in part and dissent in part.

—————————————

Stephen Schumaker, Clark County Prosecuting Attorney, and Andrew P. Pickering, Assistant Prosecuting Attorney, for appellee.

Spiros P. Cocoves; Gamso, Helmick & Hoolahan and Jeffrey M. Gamso, for appellant.

—————————————