[Cite as *State v. Carter*, 2016-Ohio-5371.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ADAMS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 15CA1015 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| PAUL W. CARTER, | : | |
| Defendant-Appellant. | : | RELEASED 08/09/2016 |

APPEARANCES:

James T. Boulger, Chillicothe, Ohio, for appellant Paul W. Carter.

David Kelley, Adams County Prosecuting Attorney, and Jonathan Coughlan, West Union, Ohio, for appellee State of Ohio.

Hoover, J.

{¶1}   Paul W. Carter ("Carter") appeals the Adams County Common Pleas Court's judgment denying his motion to dismiss. In this case, Carter filed a motion to dismiss the indictment against him based on double jeopardy grounds. On July 28, 2014, a jury was empaneled and sworn to hear the case against Carter. The State presented its first witness on July 29, 2014; and then on July 30, 2014, one of the witnesses for Carter provided testimony that the State characterized as an alibi. The State argued that Carter had not filed a notice of alibi in compliance with Crim.R. 12.1. As a result, the State moved for a mistrial. The trial court granted the mistrial. Here on appeal, Carter contends that the mistrial was granted without manifest necessity, and that the trial court erred by failing to grant his motion to dismiss based on double jeopardy grounds. The State argues that the trial court did not err in denying Carter's motion to dismiss because manifest necessity required the trial court to grant the mistrial. For the reasons

discussed more fully below, we find that the trial court's denial of the motion to dismiss was not an abuse of discretion. We overrule Carter's two assignments of error. Accordingly, we affirm the trial court's judgment.

## I. Facts and Procedural Posture

{¶2}    On June 18, 2013, the Adams County Grand Jury returned a four count indictment against Carter. The first count alleged sexual battery in violation of R.C. 2907.03(A)(5) in which Carter's granddaughter, M.S., was the alleged victim. The other three counts were alleged rapes in which Carter's daughter, Heather Carter Winterod ("Heather"), was the victim. Two counts of rape were in violation of R.C. 2907.02(A)(2) and the third count was in violation of R.C. 2907.02(A)(1)(b). The State filed its bill of particulars along with its first response to discovery request for the case on July 8, 2013. Thereafter, the State filed numerous additional responses to discovery. On August 2, 2013, Carter filed his response to discovery. Prior to the jury trial that commenced on July 29, 2014, the State had provided at least twelve different responses to discovery, and Carter had filed at least three different responses to discovery. The State had even filed an amended bill of particulars prior to the commencement of the jury trial. At no time did Carter request a more specific bill of particulars.

{¶3}    On July 16, 2014, the State moved to dismiss Count 4 of the indictment; and on July 22, 2014, the trial court entered an order of dismissal for Count 4.

{¶4}    The matter proceeded to a jury trial on July 29, 2014. At trial, the State presented the alleged victim, M.S., to testify with respect to the allegations in Count 1 of the indictment. M.S. was ten years of age at the time of the trial. M.S. explained during her testimony that she

called the "part of a girl that a girl goes pee out of" a "cookie" and a "kitty cat." M.S. also explained that she knew that same part is also called a vagina.

{¶5}    M.S. further testified as follows:

Q. Can you tell us what your Pappy did?

A. Yes.

Q. Go ahead and tell the ladies and gentlemen what happened?

A. He grabbed me by my arms and my legs together and tied them up together and put duck tape on my mouth and stuck his finger in my kitty cat.

M.S. testified that her birthday was November 26, 2003, and that the incident occurred on November 26, the day of her fourth birthday party. M.S. testified that she was scared when this occurred. She felt like Carter's finger was inserted to the middle of his finger and that it hurt. M.S. claimed that she told him to stop; and she asked for help. M.S. also testified that Carter did not stop when she asked him to stop; but that eventually he did stop when a car door slammed. She further testified that he washed his hands and put away the rope with which he used to bind her arms and legs. M.S. claimed that Carter said, "if you tell I will spank you."

{¶6}    On cross-examination, M.S. was asked, among other things, the following questions:

Q. And what time of day was this?

A. This was four hours before my birthday party.

Q. How did you determine that it was four hours?

A. Because my birthday party was at 6:15 and it was like in the morning.

Later in the cross-examination, M.S testified that the incident occurred "a couple hours before my birthday party." Then, she changed her testimony and said, "No, it was around, it was around 4 hours, something like that." When asked if she knew what time in the afternoon, she said, "No." But, she did testify that it was the "day of my birthday party" and that day was "November 26th."

{¶7}    The State next presented Linda Smets-Ullrich ("Smets-Ullrich"), a social worker, to testify. Smets-Ullrich testified about her March 2013 interview with M.S. that was held at the hospital. Smets-Ullrich did not testify regarding a particular time or date that the alleged event occurred. Her pertinent testimony was as follows:

Q. And did you seek out any further details other than that act had occurred?

A. No, for my purpose of informing [sic] the medical exam there are a couple of things I need to know. I need to know the extent of the contact and what was involved. I also need to frame the contact in terms of time because there is a time limit as to how long we can reasonably assume that there is a chance of recovering evidence from the body of the alleged victim. So those are the things that I am focused on trying to determine because that is what the medical staff will need to know when they determine what kind of exam is to be done.

Smets-Ullrich was then permitted to give her lay opinion that M.S.'s statements during her interview at the hospital were consistent with sexual abuse.

{¶8}    Kenneth Dick ("Dick") was the State's next witness. Dick is the investigator for the Prosecutor's Office in Adams County. Dick testified that he received a referral from Children's Hospital in Cincinnati that alleged that Carter had inserted his finger inside M.S.'s vagina. Dick further testified that after speaking with Heather, he understood that M.S. was Heather's daughter. Dick's investigation revealed that both M.S. and Heather had indicated that each of them had been sexually assaulted by Paul Carter. Dick, however, testified that he never spoke to M.S., only Heather.

{¶9}    As part of his investigation, Dick had organized a "controlled conversation" between Heather and her father, Carter, wherein Heather wore an audio recording device. This arranged meeting took place on April 1, 2013. This meeting was memorialized in an audiotape that was played for the jury as State's Exhibit G. During the arranged meeting, Carter did not make an explicit admission to the allegations of sexual conduct with respect to Heather. Moreover, Carter explicitly denied any sexual conduct with M.S. during the arranged meeting. At no time during the arranged meeting were any specific time frames established regarding any of the alleged offenses.

{¶10}   In addition, Carter and his attorney appeared for an interview with Dick on June 5, 2013. This interview was videotaped and was played for the jury as State's Exhibit H. The State claimed that Carter never denied the allegations; however, Carter's attorney denied the allegations during the interview. No specific time frames for the alleged offenses were mentioned during the interview.

{¶11}   The last witness called in the State's case-in-chief was Heather. Heather is the mother of M.S., the sister of Paul Carter, Jr., and the daughter of Paul Carter and Gladys Elaine

Carter. At the time of the trial, Heather was 30 years of age. Heather testified that when she was 15 years old, in eighth grade, in April 1999, she was given a homework assignment. This assignment consisted of placing a condom on a banana. When Heather got home from school, she got off the bus, went in the house, and "asked [her] dad." She testified that they were alone in the house. Heather testified that her father responded that he could help her.

> A. I was sitting on the end of the bed and he was sitting on the foot of the bed, he took the condom and started to masturbate and put the condom on himself and then a few minutes later he grabbed my hand and had me proceed to masturbate him.

{¶12}   Heather then testified that later that night another incident occurred. She said neither her mother nor her brother were home that night. Heather testified that Carter came to her bedroom, put his hand over her mouth and told her to be quiet and that he loved her. He then pulled her gown up, jerked her panties down from the side and inserted his finger into her vagina. Heather claimed that she could not talk because Carter's hand was over her mouth. She further stated that she could tell his finger was inside her vagina because "it was big and it hurt." These events were the basis of the allegations in Count 2 of the indictment.

{¶13}   Heather also testified to another incident upon which Count 3 of the indictment was based. Heather asserted that during Christmas break in December 1999, she was again home alone with Carter. She declared that Carter got on top of her, pulled down her underwear, and penetrated her vagina with his penis. Heather felt Carter ejaculate in her; and then he got up and left the room. Heather testified that Carter told her not to tell anybody.

{¶14}   In addition, Heather testified about the arranged meeting in April 2013 between Carter and her in which she wore the audio recording device. She asserted that when she talked

about Carter's actions in the past of a sexual nature towards her, he seemed to apologize for what he did to her.

{¶15}  On cross-examination, Carter's attorney questioned Heather about being married to four different men. She was also interrogated about Carter being "gone for very long days" due to his employment. Heather did not remember the long days when Carter was gone. She did answer affirmatively when questioned later that "He was gone nearly all the time, wasn't he?" Heather was also questioned about voluntarily placing her children with her parents. Carter's attorney also asked Heather about the findings of M.S.'s physical examination. Heather was aware that M.S.'s hymen was intact according to the findings of doctor's report.

{¶16}  Carter then made a motion for acquittal, which was denied by the trial court.

{¶17}  Next, the trial court heard testimony *in camera* from nurses, Kathy Lawson and Miss Klosterman. The nurses testified on the issue of whether the medical records of M.S. "where it's suggested that there is no evidence of abuse, whether that meant sexual abuse." After hearing the nurses testify, the trial court determined that M.S.'s examinations were not focused on determining whether sexual abuse occurred. The trial court ruled that neither of the testimonies of the nurses nor M.S.'s medical records from the examinations would be relevant to the issues in this case; and consequently, the testimonies and M.S.'s medical records were deemed inadmissible.

{¶18}  The State then rested.

{¶19}  In Carter's case in chief, Carter called the following witnesses who testified to Heather's reputation as being untruthful: Joan Disher (former mother-in-law of Heather); John Yates (ex-husband of Heather); Jonathan Dodds (acquaintance of Heather); Karen Rowe (aunt of

Heather); Jim Scott (ex-husband of Heather); Eli Hill (ex-husband of Heather); and Paul Carter, Jr. (brother of Heather).

{¶20} Eli Hill ("Hill") further testified that in November 2007, he was present at M.S.'s birthday party. Hill asserted that he arrived at 72 Cody Lane, West Union, Ohio, between 10:00 a.m. and 11:00 a.m. He stated that the party started about 6:00 p.m. and that he did not leave the house at any time that day. Hill testified that he [Hill] was there all day. Hill also claimed that when he left, he took M.S. and her sister with him and Heather.

{¶21} Carter also called his son, Paul Carter, Jr., as a fact witness. He testified that Carter worked for Schwans in April 1999 and Lykins BP in December 1999. Paul Carter, Jr. asserted that his father would leave for work early in the morning and would return home usually between 5:00 p.m. and 7:00 p.m. Paul Carter, Jr. also testified that his mother worked day shift for Candle-lite in 1999. He said his mother would get home around 4:00 p.m. daily.

{¶22} Carter also called his daughter-in-law, Chancy Carter, as a witness. She did not contribute any substantive testimony other than stating that she has left her own children with Carter and his wife.

{¶23} The following witnesses were called by Carter to testify to Carter's reputation as being truthful: Larry Baker (Carter's pastor); Calvin Daniel (church attendee with Carter); James Crase and Sandy Crase (neighbors of Carter who share grandchildren with Carter); and Lisa Tumbleson (former day care provider).

{¶24} Carter's last witness that he called was Gladys Elaine Carter ("Gladys"). Gladys is the wife of Carter, mother of Heather, and grandmother of M.S. Gladys testified that Heather was born in 1984. Gladys asserted that she had trouble with Heather's truthfulness. She testified that Heather had a reputation in the community of being a liar. With respect to her work in 1999,

Gladys testified that she worked for Candle-lite and that she worked day shift. She would get home between 4:00 p.m. and 4:30 p.m. As for Carter's work schedule in April 1999, Gladys claimed that Carter worked for Schwan Foods. She testified that Carter would leave home between 6:00 a.m. and 6:30 a.m. and would not return home until 12:00 midnight. Sometimes he would even get a motel room and stay in it.

{¶25}  Gladys was then questioned more specifically about the Christmas time period in 1999. Gladys testified that Carter was working for BP at that time. She asserted that Carter did not get out of bed at any time during that Christmas season. Gladys also testified about M.S. and her sister living with Carter and her from 2005 until 2013 when the girls were returned to Heather's custody.

{¶26}  The questions asked of Gladys then turned toward M.S.'s fourth birthday party. Gladys was asked the following questions:

Q. Was Paul there?

A. He had to work that day.

Q. When did he get there?

A. He wasn't there until later on in the afternoon.

{¶27}  The State immediately objected on the basis of Carter's violation of Crim.R. 12.1 for his failure to file a notice of alibi. The trial court then held a hearing outside the presence of the jury in which Gladys continued to testify. *In camera*, Gladys claimed that Carter got home from work around 3:30 p.m. The trial court and Carter's attorney then discussed whether or not

Gladys's testimony was an alibi. The discussions between the trial court and Carter's attorney continued as follows:

MR. HAPNER: Your Honor, in order to give notice of alibi we would have to know, we know the place and the date.

THE COURT: You've known since yesterday. Did you notify the State of Ohio that you may not have had seven days notice, did you notify the State of Ohio of this?

MR. HAPNER: No, the fact of the matter is it didn't come up until right now. We were aware that he might have worked that morning, but we had no idea until yesterday, we thought actually that the crime was committed at night.

THE COURT: After the birthday party?

MR. HAPNER: Uh-uh.

THE COURT: But as of yesterday you heard the testimony and you knew there was some question that Mr. Carter was not there?

MR. HAPNER: He was there at the birthday party and before on the 26th day of November.

THE COURT: Mr. Hapner, you knew the time, I think you inquired, you asked several questions about the alleged victim of the time and you challenged her on some of her calculations, did you not?

MR. HAPNER: I did, but that's the reason for that, well, first of all it took us by surprise, a great deal of what she testified to took us by surprise. But, the time had not come up before, my assumption was it took place in the evening some time.

THE COURT: So, once the time did come up and you were fully aware of it and you cross-examined her on that and you knew that Mr. Carter was not there on certain parts of that date did you notify the State that potentially there was an alibi as required under 12.1?

MR. HAPNER: No, I did not notify the State as to an alibi because I did not then or today consider it an alibi.

* * *

MR. HAPNER: That means that going into this trial seven days prior to we had no idea they claimed it took place at 2:00 o'clock in the afternoon.

THE COURT: I have acknowledged that. But when you knew yesterday morning—

MR. HAPNER: Well, I really didn't know about his working until yesterday evening when we talked.

THE COURT: Did you declare it this morning?

MR. HAPNER: No.

THE COURT: Did you declare it right after lunch?

MR. HAPNER: No.

{¶28}   The State then moved for a mistrial. Carter's attorney did not make an explicit objection to the granting of the mistrial at this time; but he did offer an alternative to mistrial: "[Y]ou can order us just to go around when we got home and what time he got home." The trial court then called the jury back to the courtroom and declared a mistrial.

{¶29}   After the jury was discharged, the following exchange took place:

THE COURT: Please be seated. In issuance of this mistrial the Court will find that the mistrial was occasioned by the acts of the defense in proffering testimony in violation of 12.1, failure to give notice timely when known. Mr. Hapner has suggested that he knew as of last night of these matters, he never disclosed these matters to counsel that there would be alibi in this matter, he had full opportunity to speak to the witness in this case, being Ms. Carter, and he has, I assume, spoken to her about the testimony. With that said, the Court finds that because of the mistrial being occasioned and caused by defense that this would not be subject to double jeopardy for purposes of re-trial. * * *

Carter's attorney then asked the court to note their exceptions to the declaration of mistrial that "it is not prejudicial error to such extent that would require a mistrial."

{¶30}   The trial court responded to Carter's exception as follows:

THE COURT: * * * [T]he Court would find no interest in justice that the rules of evidence are very specific, the rules of discovery are very specific, while the Court accepts that you may not have known seven days ago that was the basis, if you had not determined that was the basis, when did you know that there was a full fledged alibi, that apparently was last evening. And did you ever disclose it,

and it was never disclosed. Maybe this morning had it been disclosed there could

have been curative affects [sic]. But, there was no disclosure for reasons that are

personal to you that has caused this mistrial. And the prejudicial affect [sic] of the

testimony we can not unring this bell. * * *

{¶31}   At no time did Carter request severance of the other two counts of the indictment.

He did not request that the Court proceed with the trial as to the other two counts.

{¶32}   The mistrial was journalized on August 12, 2014.

{¶33}   After the mistrial was granted, a notice of alibi was filed on May 6, 2015. Prior to

the second trial date, Carter, through a new attorney, filed a motion to dismiss based on double

jeopardy grounds. The trial court denied Carter's motion to dismiss.

{¶34}   Carter filed a timely notice of appeal.

## II. Assignments of Error

{¶35}   Carter assigns two assignments of error for our review:

FIRST ASSIGNMENT OF ERROR:

> THE TRIAL COURT DECLARED A MISTRIAL AND DISCHARGED THE
> JURY WITH RESPECT TO COUNT I OVER DEFENSE OBJECTION, AND
> WITHOUT MANIFEST NECESSITY. FURTHER PROSECUTION OF COUNT
> I VIOLATES THE DEFENDANT'S RIGHT TO BE FREE FROM DOUBLE
> JEOPARDY AS GUARANTEED UNDER THE FIFTHE [SIC] AMENDMENT
> OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10
> OF THE OHIO CONSTITUTION SO THAT THE COURT ERRED IN
> DENYING THE DEFENDANT'S MOTION TO DISMISS ON THIS GROUND.

SECOND ASSIGNMENT OF ERROR:

THE TRIAL COURT DECLARED A MISTRIAL AND DISCHARGED THE JURY WITH RESPECT TO COUNTS II AND III OVER DEFENSE OBJECTION, AND WITHOUT MANIFEST NECESSITY. FURTHER PROSECUTION OF THESE COUNTS VIOLATES THE DEFENDDANT'S [SIC] RIGHT TO BE FREE FROM DOUBLE JEOPARDY AS GUARANTEED UNDER THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION SO THAT THE COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO DISMISS ON THIS GROUND.

### III. Law and Analysis

#### A.      Standard of Review

{¶36}   This Court has discussed the standard of review when evaluating whether a second trial can be had after a mistrial over the defendant's objection in *State v. McCain*, 4th Dist. Pickaway No. 01CA22, 2002-Ohio-5342, ¶ 28, fn. 4:

Our research has indicated, however, that the manifest necessity standard is employed when evaluating whether a second trial can be had after a trial court's sua sponte declaration of a mistrial or of a mistrial over the defendant's objection.

For example, in *Cleveland v. Wade* (Apr. 10, 2000), Cuyahoga App. No. 76652, the court stated: "Where the mistrial was granted upon the request of the prosecutor and over the objection of the defendant, the state carries the burden of demonstrating the manifest necessity of the mistrial in order to avoid the double jeopardy bar. See *Arizona v. Washington* (1978), 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717.* * *"

{¶37}   Furthermore, this Court stated in *State v. Hoyt*, 4th Dist. Ross No. 1563, 1990 WL 54964, *3 (Apr. 13, 1990):

Jeopardy in this case, a trial to the court, attached when the first witness was

sworn and testimony taken. *State v. Dallman* (1983), 11 Ohio App. 3d 64.

However, "an exception to the bar is created when, on a government motion or, sua sponte, the court grants a mistrial because of 'manifest necessity' or to prevent defeat of 'the ends of public justice.'" See *State v. Widner*, supra at 189. *State v. Aldridge* (1981), 3 Ohio App. 3d 73, 78, citing to *Illinois v. Somerville* (1973), 410 U.S. 458, 467; *United States v. Perez* (1824), 9 Wheat. (22 U.S.) 579, 580. "Precise and justified reasons must be made to appear for a mistrial if a retrial is permitted." 3 Ohio App. 3d at 79, citing to *United States v. Bristol* (D.C. App. 1974), 325 A.2d 183, 187. Further, appellate courts traditionally have given weight to a trial court's assessment as to the necessity for a mistrial when deciding questions of double jeopardy. *Oregon v. Kennedy* (1982), 456 U.S. 667, 676 fn. 7. As stated by the U.S. Supreme Court in *Gori v. United States* (1961), 367, 367 U.S. 364:

"Where for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be obtained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment."

Therefore, we must ultimately look to the trial court's decision to grant the mistrial and evaluate whether a manifest necessity was demonstrated in order to determine whether the denial of the motion to dismiss was proper.

{¶38} This standard of review was further explained by the First Circuit Court of Appeals in *United States v. Keene*, 287 F.3d 229, 233-234 (1st Cir.2002):

Our standard of review is intricate. Technically, we are called upon to review the [trial] court's denial of a motion to dismiss on double jeopardy grounds. * * * [T]he correctness of the [trial] court's decision ultimately hinges on the justification for ordering a mistrial. The decision as to whether to declare a mistrial speaks to the informed discretion of the [trial] court, and is customarily reviewed only for abuse of that discretion. See *United States v. Pierro,* 32 F.3d 611, 617 (1st Cir.1994). Where, as here, a motion to dismiss on double jeopardy grounds trails in the wake of the [trial] court's declaration of a mistrial, both the Supreme Court and this court have consistently applied an abuse of discretion standard in reviewing appeals from the denial of such motions. E.g., *Arizona v. Washington,* 434 U.S. at 514, 98 S.Ct. 824 * * *; *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971) * * *. We therefore review the [trial] court's decision here for abuse of discretion.

" * * * As we use the term [abuse of discretion], it encompasses multiple layers of inquiry. *See Koon v. United States,* 518 U.S. 81, 98-100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). In the course of such review, "we accept the trial court's factual findings only to the extent that they are not clearly erroneous." *United States v. Bradshaw,* 281 F.3d 278, 291 (1st Cir.2002). In contrast, we evaluate the [trial] court's articulation of applicable legal rules de novo, cognizant that a mistake of law is equivalent to an abuse of discretion. *In re Grand Jury Subpoena,* 138 F.3d 442, 444 (1st Cir.1998); *United States v. Snyder,* 136 F.3d 65, 67 (1st Cir.1998). Only then do we inquire whether, in view of all the facts and circumstances, the trial court's finding of a manifest necessity to discharge the

jury and declare a mistrial constitutes a misuse of its discretion. *See Illinois v.*

*Somerville,* 410 U.S. 458, 462-63, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); *Brady v.*

*Samaha,* 667 F.2d 224, 228 (1st Cir.1981).

**B.  Manifest Necessity Existed for the Declaration of a Mistrial with Respect to**

**Count 1; and the Trial Court did not Abuse its Discretion in Denying the**

**Motion to Dismiss**

{¶39}  In Carter's first assignment of error, he argues that the trial court granted a

mistrial over defense objection and without manifest necessity. In turn, Carter argues that

further prosecution of Count 1 violates his constitutional right to be free from Double Jeopardy

and that the trial court erred when it denied his motion to dismiss. The State contends that

manifest necessity existed for the declaration of the mistrial and that the trial court did not err

by denying the motion to dismiss.

{¶40}  In light of the above standard of review, we must defer to the trial court's factual

findings based on the record at the time of the mistrial. The record is perspicuous that during her

testimony, M.S. claimed that the alleged incident occurred approximately four hours before her

birthday party. This would have placed the alleged event occurring at around 2:00 p.m. Carter

became aware of this specific time frame as soon as M.S. testified. The next day, during Carter's

case in chief, Gladys then testified that Carter did not get home until later that afternoon. Outside

the presence of the jury, Gladys revealed that her testimony would be that Carter arrived home

from work at 3:30 p.m.

{¶41}  We next review the trial court's application of the law to the facts de novo.

Carter's counsel argued that Gladys's testimony was not an alibi. "Alibi" is defined as:

A defense based on the physical impossibility of a defendant's guilt by placing

the defendant in a location other than the scene of the crime at the relevant time.

*Black's Law Dictionary* (10th Ed.2014).

{¶42} Gladys's testimony stating that Carter did not arrive home until 3:30 p.m. offered evidence to show that he was in another place at the time of the alleged offense. Gladys's testimony is clearly an alibi that should have been disclosed pursuant to Crim.R. 12.1. Therefore, under a de novo review, we agree with the trial court's assessment that Gladys's testimony that Carter arrived home outside the time that the alleged event occurred was an alibi.

{¶43} Now we view all the facts and circumstances as a whole to determine whether the trial court's finding of a manifest necessity to discharge the jury and declare a mistrial constituted an abuse of its discretion. After the trial court declared that Gladys's testimony was indeed an alibi, Carter's counsel then claimed that he did not know about Carter working until the evening after M.S.'s testimony. As a result, the following exchange took place between the trial court and Carter's counsel:

THE COURT: Did you declare it this morning?

MR. HAPNER: No.

THE COURT: Did you declare it right after lunch?

MR. HAPNER: No.

{¶44} The trial court explained to Carter that had the alibi information been disclosed promptly that morning, then there might have been "curative" effects that could have been put in place, and alternatives other than mistrial may have been possible. The trial court was clear in its

"Judgment Entry of Mistrial" that it found the failure to comply with Crim.R. 12.1 was willful. Further, in the trial court's judgment entry denying Carter's motion to dismiss, the trial court stated: "After listening to the questioning of witnesses and observing the strategy of both sides, the Court finds that Defense Counsel's failure to provide the State with an Alibi Notice warrants the declaration of a mistrial." The trial court further states in its judgment entry that "[h]aving sat six feet away from the witnesses and Counsel, the Court is most capable at ascertaining meaning behind the happenings at trial." We agree. The trial court was best situated intelligently to deem compelling the reasons for granting the mistrial.

{¶45} In view of all the facts and circumstances, the trial court's finding of a manifest necessity to discharge the jury and declare a mistrial did not constitute a misuse or abuse of its discretion. Ample evidence exists to find that the trial court declared the mistrial so as to ensure that the ends of justice would be obtained. The trial court's declaration of a mistrial was designed to promote the ends of justice. We overrule Carter's first assignment of error.

## C. Manifest Necessity Existed for the Declaration of a Mistrial with Respect to Counts 2 and 3; and the Trial Court did not Abuse its Discretion in Denying the Motion to Dismiss

{¶46} In his second assignment of error, Carter contends that the trial with respect to Counts 2 and 3 should have proceeded even if Count 1 was subject to mistrial. Carter argues that Counts 2 and 3 should have been severed from Count 1. Carter claims that manifest necessity did not exist for the declaration of the mistrial with respect to Counts 2 and 3. The State argues that manifest necessity required the trial court to grant the mistrial as to Counts 2 and 3. The State further argues that Carter waived the argument of severance since he did not mention this option to the trial court.

{¶47}   Carter cites to an Eleventh Circuit Court of Appeals case, *Venson v. Georgia*, 74

F.3d 1140 (11th Cir.1996) in support of his second assignment of error. The *Venson* case was

based on a petition for a writ of habeas corpus pursuant to 28 U.S.C. Sec. 2254. In the underlying

case that took place in a Georgia state court, Venson was accused of three counts of sexual

battery involving three female students while Venson was a schoolteacher. *Id.* at ¶ 2. The

Eleventh Circuit Court of Appeals affirmed the district court's decision that held that Venson's

second trial in the Georgia state court on sexual battery charges violated his Fifth Amendment

right against double jeopardy. *Id.* at ¶ 37. The state court had granted a mistrial because

Venson's attorney had asked an improper question under Georgia law. *Id.* at ¶ 33. The Eleventh

Circuit found that the improper question "resulted in such minimal prejudice to the state on

Count One that finding manifest necessity for a mistrial on that count was an abuse of

discretion." *Id.* at ¶ 33.

{¶48}   In *Venson*, the Eleventh Circuit stated:

The improper impeachment of Shockley had a very minimal prejudicial impact on

the state's case against Venson on Count One. Shockley did not witness the

incident between Venson and McNeeley that formed the basis for Count One, and

the two girls never discussed Venson's behavior with each other before reporting

it. The only possible theory on which Shockley's testimony was relevant to Count

One was that Venson's conduct, as described by Shockley, was similar to the

conduct made the subject of the charge in Count One. The accounts of Shockley

and McNeeley are similar in that they both describe Venson improperly touching

female students, but the similarity ends there. McNeeley testified that Venson

hugged her when they were alone after class, but Shockley testified that she was

touched by Venson while class was in session. The incidents described by the two

girls also occurred during different school years. Finally, the fact that the state's

case on Count One was supported by the testimony of three other witnesses

buttresses our conclusion that the state suffered little prejudice on that count.

*Id.* at ¶ 36.

{¶49}  In contrast, in this case, the trial court made the following findings in its judgment

entry denying Carter's motion to dismiss:

The Court also finds that the nature of the offenses alleged, and fact that the

victims were mother and daughter, intertwines said offenses to the extent that a

curative instruction would not have removed the unfair nature created by the

failure to provide an Alibi Notice. Further, the Court finds trial counsel failed to

request severance of counts two and three with respect to the mistrial motion and

the defendant has thus waived his objection.

{¶50}  In the case sub judice, testimony was presented by investigator Kenneth Dick that

he had spoken with Heather only and had not spoken with M.S. However, Dick testified that he

was aware that M.S. had indicated that Carter had sexually assaulted her. Also, Dick had

received a referral from Children's Hospital in Cincinnati that alleged that Carter had inserted his

finger inside M.S.'s vagina. This information indicates that M.S. and Heather have discussed the

allegations against Carter and that Heather has relayed M.S.'s accusations to Dick and Children's

Hospital. In addition, Dick testified about the "controlled conversation" between Heather and her

father. During the arranged meeting that was audiotaped, Carter and Heather alluded to the

allegations of sexual conduct with respect to Heather and M.S. although Carter explicitly denied

any sexual conduct with M.S. during the arranged meeting. All of this evidence intertwines

mother and daughter and the offenses.

{¶51}  *Venson* is not controlling here. It is only persuasive authority. In addition, the facts in *Venson* are dissimilar to those before us. We, therefore, decline to follow the reasoning of the Eleventh Circuit Court of Appeals in *Venson*.

{¶52}  Next, we address Carter's argument that the trial court should have severed Count 1 from Counts 2 and 3 and proceeded with the trial on Counts 2 and 3. This Court has stated in *State v. Miller*, 105 Ohio App.3d 679, 691, 664 N.E.2d 1309 (4th Dist.1995):

> A Crim.R. 14 motion for severance of counts due to prejudicial misjoinder is
>
> waived unless it is renewed at the close of the state's case or at the conclusion of
>
> all the evidence. *State v. Strobel* (1988), 51 Ohio App.3d 31, 554 N.E.2d 916,
>
> paragraph two of the syllabus; *State v. Owens* (1975), 51 Ohio App.2d 132, 5
>
> O.O.3d 290, 366 N.E.2d 1367, paragraph two of the syllabus; *State v. Cisternino*
>
> (Oct. 27, 1994), Cuyahoga App. No. 66387, unreported, 1994 WL 590523; *State*
>
> *v. Yascone* (Dec. 17, 1987), Cuyahoga App. Nos. 48383 and 48384, unreported,
>
> 1987 WL 29675. See, also, *State v. Walker* (1990), 66 Ohio App.3d 518, 585
>
> N.E.2d 848. In the case *sub judice,* appellant failed to renew his pretrial motion to
>
> sever the counts of the indictment at the close of the state's case or at the close of
>
> all the evidence. Therefore, this court concludes that appellant has waived his
>
> right to argue severance on appeal. *Owens* and *Cisternino, supra.*

{¶53}  Here, although this case is in the context of a mistrial, we believe that Carter was still required to make a motion to sever Count 1 from Counts 2 and 3 if he desired the trial court to consider severance of the counts and to proceed to trial on Counts 2 and 3. At no time did

Carter make a motion to sever. In fact, Carter's exceptions to the mistrial ruling included in whole the following: "[I]t is not prejudicial error to such extent that would require a mistrial."

{¶54}   In addition to finding that Carter waived his right to argue severance on appeal, we find that Counts 1, 2, and 3 were intertwined to such an extent that manifest necessity existed to order the mistrial of the entire case. The trial court did not abuse its discretion in denying Carter's motion to dismiss. Accordingly, we overrule Carter's second assignment of error.

## IV. Conclusion

{¶55}   Having overruled both of Carter's assignments of error, we hereby affirm the trial court's judgment.

JUDGMENT AFFIRMED.

Harsha, J., concurring:

{¶56}   I concur in the judgment and opinion on the first assignment of error.  However, I concur in judgment only on the second assignment of error.  I would not address the merits of whether the trial court abused its discretion in declaring a mistrial for the rape charges involving Carter's daughter.

{¶57}   As the majority notes by failing to raise this error below, Carter forfeited all error but plain error concerning the trial court's failure to sever the charges and allowing the rape charges to proceed by not restricting the mistrial to the sexual-battery charge.  *State v. Rogers*, 143 Ohio St.3d 385, 2015 -Ohio- 2459, 38 N.E.3d 860, ¶ 21-23. And because Carter did not argue plain error, we need not address it.  *See State v. Gavin*, 4th Dist. Scioto No. 13CA3592, 2015-Ohio-2996, ¶ 25, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17-20 (appellate court need not consider plain error where appellant fails to timely raise plain-error claim), and *Wright v. Ohio Dept. of Jobs & Family Servs.*, 9th Dist. Lorain No.

12CA010264, 2013–Ohio–2260, ¶ 22 (when a claim is forfeited on appeal and the appellant does not raise plain error, the appellate court will not create an argument on his behalf).

{¶58}   Therefore, I would exercise the discretion accorded to appellate courts under Crim.R. 52(B) by declining to apply the plain-error doctrine here. *See, e.g., State v. Smith*, 4th Dist. Scioto No. 15CA3686, 2016-Ohio-5062, ¶ 127 (Harsha, J., concurring in part and dissenting in part), citing *State v. Barnes*, 98 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002), and *Rogers* at ¶ 22; *see also State v. Askew*, 4th Dist. Ross No. 05CA2877, 2006–Ohio–4769, ¶ 23. This is consistent with the Supreme Court's admonition that courts should "notice plain error 'with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice.' " (Emphasis added.) *Barnes* at 27, 759 N.E.2d 1240, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED. Appellant shall pay the costs.

The Court finds that reasonable grounds existed for this appeal.

It is ordered that a special mandate issue out of this Court directing the Adams County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court.  If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

McFarland, J.: Concurs in Judgment and Opinion.
Harsha, J.: Concurs in Judgment and Opinion on First Assignment of Error; Concurs in Judgment Only on Second Assignment of Error with Opinion.

For the Court

BY: _____
         Marie Hoover, Judge

### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**